**In re CAUCUS DISTRIBUTORS, INC., Debtor.**

**In re CAMPAIGNER PUBLICATIONS, INC., Debtor.**

**In re FUSION ENERGY FOUNDATION, INC., Debtor.**

**Bankruptcy Nos. 87–00795–A to 87–00797–A.**

United States Bankruptcy Court, E.D. Virginia, Alexandria Division.

Oct. 25, 1989.

■■■■■■■■■■

David R. Kuney, Christine L. Dibble, David & Hagner, James A. Bensfield, Raymond D. Battocchi, Cole and Groner, P.C., Richard H. Gins, Brian R. Seeber, Gins & Seeber, P.C., Washington, D.C., and H. Jason Gold, Gold & Stanley, Alexandria, Va., for alleged debtors.

S. David Schiller, Asst. U.S. Atty., E.D. Va., Richmond, Va.

Robert O. Tyler, Trustee in Bankruptcy, Alexandria, Va., for Caucus Distributors, Inc.

Kermit A. Rosenberg, Trustee in Bankruptcy, McLean, Va., for Fusion Energy Foundation, Inc.

Roy B. Zimmerman, Alexandria, Va., for Robert O. Tyler and Kermit A. Rosenberg, trustees.

James M. Lewis, Trustee in Bankruptcy, McLean, Va., for Campaigner Publications, Inc.

H. Slayton Dabney, McGuire, Woods, Battle and Boothe, Richmond, Va., for James M. Lewis, trustee for Campaigner Publications, Inc.

Arthur S. Salus, Philadelphia, Pa.

William E. Robertson, Jr., Dykema, Gossette, Spencer, Goodnow & Trigg, Sarasota, Fla., for NCNB/National Bank of Florida, Guardian for Charles R. Zimmerman.

David McC. Estabrook, Cochran & Pijor, P.C., McLean, Va., for MCI.

Peter J. Gonzalez d/b/a San Souci Travel, Inc., Floral Park, N.Y.

W. John McNally, III, McNally & Kunz, Washington, D.C., for NCNB.

Ellen Marie Dowling, Barbara Rose, Com. of Va., Dept. of Taxation, Richmond, Va.

## MEMORANDUM OPINION

MARTIN V.B. BOSTETTER, Jr., Chief Judge.

This matter is before the Court upon the involuntary petitions in bankruptcy filed by the United States against Caucus Distributors, Inc. ("Caucus"), Campaigner Publications, Inc. ("Campaigner"), and Fusion Energy Foundation, Inc. ("Fusion").[1] The involuntary petitions, which request relief under Chapter 7 of the United States Bankruptcy Code ("the Code"), were filed on April 20, 1987. *See* 11 U.S.C. § 101 *et seq.* The United States based the petitions upon claims outstanding against the debtors totalling approximately 16–million dollars. The claims consisted of contempt fines imposed upon the debtors for their failure to comply with grand jury subpoenas. The United States filed the petitions as a sole petitioning creditor and did not make reference to the total number of creditors of each debtor.[2]

Upon the denial of two motions for dismissal, answers to the petitions were filed on June 25, 1987. The government then filed a motion for summary judgment in each case. After the filing of the debtors' answers but before the Courts' disposition of the motions for summary judgment, creditors intervened in each of the petitions, bringing the number of petitioning creditors to a minimum of three in each case.

---

1. The debtors allegedly are controlled by Lyndon H. LaRouche.

2. Since the imposition of the contempt fines, the First Circuit has determined that amounts assessed against the debtors after the life of the grand jury must be excluded from the aggregate fines. *See In re Grand Jury Proceedings (Caucus Distributors, Inc., et al.),* 871 F.2d 156 (1st Cir. 1989). The fines have been recalculated by the District Court for the District of Massachusetts as follows: Caucus Distributors, Inc.: $2,610,-000 (formerly $6,055,000); Campaigner Publications, Inc.: $2,770,000 (formerly $5,110,000);

Fusion Energy Foundation: $2,770,000 (formerly $5,110,000). *See In re Grand Jury Proceedings (Caucus Distributors, Inc., et al.,* (M.B.D. Nos. 85–203—206, Sept. 13, 1989). The reduction in the amounts has no bearing upon the status of the United States as a petitioning creditor, as the Code requires only that the total amount of claims against an involuntary debtor "aggregate at least $5,000 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims." 11 U.S.C. § 303(b)(1).

On March 8, 1988, this Court issued a memorandum opinion, which clarified that the United States was the holder of a claim, which was not contingent as to liability, nor subject to a bona fide dispute. *See In re Caucus Distributors, Inc.*, 83 B.R. 921, 927–28 (Bankr.E.D.Va.1988). This Court denied the government's motion for summary judgment, however, on the basis that a genuine issue remained as to whether Caucus and Fusion were debtors against whom the United States may proceed, and whether the debtors were generally not paying their debts. *Id.* at 930, 932; *see* 11 U.S.C. §§ 303(a), (h)(1).[3] Accordingly, the Court declined to rule on the issue of whether the government filed the involuntary petitions against the debtors in bad faith. *Id.* at 932 n. 12.

A trial on the issues remaining for adjudication was held and at the close of the government's case, counsel for the debtors moved again to dismiss the involuntary petitions. *See* Fed.R.Civ.P. 41(b). The Court took the debtors' motion under advisement and completed the trial on the merits.[4] Pursuant to Federal Rule of Civil Procedure 41(b), we now consider whether this Court should dismiss these involuntary proceedings "on the ground that upon the facts and the law the plaintiff has shown no right to relief." *Id.*

The first basis asserted by the debtors in support of the instant motion to dismiss is that the government should not be allowed to proceed as a matter of law in an involuntary bankruptcy proceeding against parties whom the government also is prosecuting for criminal violations in another forum. Secondly, the debtors assert that an involuntary petition filed by a sole petitioning creditor *with* the knowledge that a debtor has in excess of twelve creditors warrants dismissal as a matter of law. We consider these grounds in the order proposed.

## PARALLEL CRIMINAL PROCEEDINGS

■ At the time the involuntary petitions were filed, the alleged debtors had been the subject of criminal investigations for approximately two and one-half years.[5] Accordingly, the debtors have identified the threshold issue to be "whether the Government of the United States may file an involuntary bankruptcy petition against an entity when such entity concurrently is the target of a federal prosecution or investigation." Alleged Debtors' Proposed Conclusions of Law, p. 1. We decline to address the issue as posed, however, in view of the fact that the eligibility of a creditor to file an involuntary bankruptcy petition is governed by the provisions of the Bankruptcy Code. *See* 11 U.S.C. § 303(b)(1), *infra* at 896; 11 U.S.C. §§ 101(9) (defining "creditor"); 101(4) (defining "claim"). It is beyond the purview of this Court, therefore, to determine that the government may *never* file an involuntary petition against an entity defending a parallel criminal proceeding. We shall consider, however, whether the harm alleged by the debtors from the prosecution of parallel proceedings has occurred here, and a stay or dismissal warranted on the facts of this case.

> (1) the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute[.]
> 11 U.S.C. §§ 303(a), (h)(1).

**4.** The debtors renewed their motion to dismiss at the close of trial. Transcript of Trial Vol. IV, p. 156 (hereinafter "Tr. Vol. ——, p. ——").

**5.** Mr. William Weld who had been the head of the Criminal Division of the Justice Department from September 15, 1986 to March 29, 1988, testified that in late October or early November of 1984, a grand jury convened to investigate the debtors and allegations regarding their involvement in credit card fraud. Tr. Vol. IV., pp. 42–45.

**3.** Sections 303(a) and (h)(1) of the Bankruptcy Code provide:

§ 303. Involuntary cases
(a) An involuntary case may be commenced only under chapter 7 or 11 of this title, and only against a person, except a farmer, family farmer, or a corporation that is not a moneyed, business, or commercial corporation, that may be a debtor under the chapter under which such case is commenced.
(h) If the petition is not timely controverted, the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed. Otherwise, after trial, the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed, only if—

The debtors base their assertion that the government's prosecution of parallel criminal and bankruptcy cases against them is prohibited as a matter of law upon the United States Supreme Court's ruling in *United States v. Kordel,* 397 U.S. 1, 90 S.Ct. 763, 25 L.Ed.2d 1 (1970) and its progeny. In *Kordel,* the Supreme Court examined the criminal convictions of two corporate officers and the issue of whether the "Government's use of interrogatories to obtain evidence from the respondents in a nearly contemporaneous civil condemnation proceeding operated to violate their Fifth Amendment privilege against compulsory self-incrimination." [6] 397 U.S. at 2–3, 90 S.Ct. at 764–65.

With respect to the discovery requests, the *Kordel* Court noted that the defendants "never asserted, let alone demonstrated that there was no authorized person who could answer the interrogatories without the possibility of compulsory self-incrimination." *Id.* at 9, 90 S.Ct. at 768 (footnote omitted). In fact, the Court noted that the first defendant who answered the interrogatories never claimed the Fifth Amendment privilege nor claimed that he answered without representation of counsel or an appreciation of the possible consequences. *Id.* at 9–10, 90 S.Ct. at 768–69. In so doing, that defendant could not "complain now that he was compelled to give testimony against himself." *Id.* at 10, 90 S.Ct. at 768. The Supreme Court further observed with respect to the second defendant that "[n]ot only did [he] never assert the privilege; he never even answered any interrogatories[,]" thus making the claim of compulsory self-incrimination even more tenuous. *Id.*

The Supreme Court also rejected the defendants' assertions that the government's conduct if not violative of the Fifth Amendment nevertheless "reflected such unfairness and want of consideration for justice," on the basis that such a ruling would "stultify enforcement of federal law[.]" *Id.* at

11, 90 S.Ct. at 769. Accordingly, the Supreme Court reversed the Sixth Circuit and upheld the convictions. *Id.* at 13, 90 S.Ct. at 770. It was in dictum that the Supreme Court suggested that *had* the defendants claimed that no one could "answer the interrogatories addressed to the corporation without subjecting himself to a 'real and appreciable' risk of self-incrimination.... the appropriate remedy would be a protective order under Rule 30(b), postponing civil discovery until termination of the criminal action." [7] *Id.* at 8–9, 90 S.Ct. at 767–68.

In *Afro–Lecon, Inc. v. United States,* the Federal Circuit examined the issue left open in *Kordel.* 820 F.2d 1198 (Fed.Cir. 1987). In *Afro–Lecon,* a corporation that had filed a civil claim against the United States discovered during the midst of the proceedings that it was the subject of a grand jury investigation of matters related to its civil suit. *Id.* at 1199–1200. The corporation moved to suspend the civil proceedings before the General Services Administration Board of Contract Appeals ("the Board") because key witnesses had been advised by counsel not to respond to discovery requests to avoid incrimination in the criminal proceedings. *Id.* at 1200. The Board denied the motion to suspend, noting "that Afro–Lecon, as the party asserting the civil claim, could not use the fifth amendment as a basis to defer civil proceedings." *Id.*

The Federal Circuit noted that "[t]he non criminal proceeding, if not deferred might undermine the party's Fifth Amendment privilege against self-incrimination, expand rights of criminal discovery beyond the limits of Federal Rule of Criminal Procedure 16(b), expose the basis of the defense to the prosecution in advance of criminal trial, or otherwise prejudice the case." 820 F.2d at 1203 (quoting *Securities & Exchange Comm'n v. Dresser Indus., Inc.,* 628 F.2d 1368, 1375–76 (D.C.Cir.), *cert. denied,* 449 U.S. 993, 101 S.Ct. 529, 66 L.Ed.2d 289 (1980)). While determining that the "dangers of parallel proceedings ha[d] already

---

6. The Fifth amendment to the United States Constitution provides: "No person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.

7. The federal rule governing the issuance of protective orders with respect to discovery matters is now Federal Rule of Civil Procedure 26(c).

been realized," (a motion to suppress the fruits of the discovery abuses had been granted in part and denied in part), the Federal Circuit remanded the case to determine whether there was any further danger of discovery abuse, if the continuance of the civil case would interfere with the administration of the criminal proceedings, and for a more complete assessment of any sources of information in Afro–Lecon's files that could be conveyed to a corporate agent designated to respond. *Id.* at 1204, 1207.

At the outset, we find the instant situation clearly inapposite. We deal here not with the propriety of convictions based upon information obtained in civil proceedings, as in *Kordel,* nor with an attempt to prevent discovery abuses, as in *Afro–Lecon.* In fact, the debtors maintain not that the United States has gained an advantage in any criminal trial as a result of the filing of these petitions, but rather that the government somehow has gained an advantage in these civil proceedings by the mere existence of the criminal actions, and/or that these petitions could not be defended adequately in view of the need of the debtors' representatives to assert the Fifth Amendment.

The debtors' insistence that the parallel proceedings and the alleged advantage gained by the government in the instant situation is somehow violative of the debtors' rights is unfounded. Even if we assume that there has been a transfer of information from the criminal division to the civil, the primary basis for the courts' rulings in *Kordel* and *Afro–Lecon,* the fear that the criminal division may gain access to incriminating information by use of a more liberal discovery process in civil litigation, is not present. If the debtors believe that *any* cooperation between the criminal and civil division is prohibited, a contention which the debtors do not support with any authority,[8] we note that no harm has come from the interaction. The representatives of the debtors all claimed the Fifth Amendment, not one ever testified or complied with requests for discovery.

The potential for abuse may have existed when the government requested a list of creditors from the debtors under Bankruptcy Rule 1003(b), or when representatives of the debtor corporations were subpoenaed to testify at trial, but the debtors do not allege that the government obtained new information as a result of the filings.[9] In

---

**8.** The debtors' intimation that any and all cooperation between the criminal and civil divisions of the U.S. Attorneys' office is prohibited does not comport with the realities of federal law enforcement. The Supreme Court in *Kordel* clearly stated that "[i]t would stultify enforcement of federal law to require a governmental agency such as the FDA invariably to choose either to forgo recommendation of a criminal prosecution once it seeks civil relief, or to defer civil proceedings pending the ultimate outcome of a criminal trial." *Kordel v. United States,* 397 U.S. at 11, 90 S.Ct. at 769. Thus the transfer of information between civil and criminal agencies, or branches within agencies often has been acknowledged by the courts. *See United States v. Renda,* No. 87–20049–01, slip. op., (D.Kan. Oct. 1, 1987) ("Nothing forecloses those two arms of the federal government [Federal Deposit Insurance Corporation and U.S. Department of Justice] from doing their jobs. And the law does not prohibit them from exchanging information with each other so that both may better perform their jobs."); *accord United States v. Copple,* 827 F.2d 1182, 1189 (8th Cir.1987) (investigation by administrative agency not improper merely because it seeks evidence that by its nature could be relevant to a civil as well as potential criminal proceeding), *cert. denied,* 484 U.S. 1073, 108 S.Ct. 1046, 98 L.Ed.2d 1009 (1988); *Pickel v. United States,* 746 F.2d 176, 183, 185 (3d Cir.1984) (noting investigation of criminal violations of the Internal Revenue Code is a valid purpose for issuance of a summons under 26 U.S.C. § 7602 until investigation is referred to Justice Department); *Securities & Exchange Comm'n v. Dresser Indus., Inc.,* 628 F.2d 1368, 1384–87 (D.C.Cir.) (effective enforcement of securities laws requires that SEC and Justice Department be able to investigate possible violations simultaneously; declining to adopt prior ruling of D.C. Circuit which prescribed that once Justice Department initiated criminal proceedings by means of grand jury, SEC could not provide Justice Department with fruits of SEC civil discovery gathered after the decision to prosecute), *cert. denied,* 449 U.S. 993, 101 S.Ct. 529, 66 L.Ed.2d 289 (1980).

**9.** On the date that the instant petitions were filed, April 20, 1987, the Bankruptcy Rule of Procedure titled "Joinder of Petitioner After Filing" was numbered 1003(d). Rule 1003 was amended on March 30, 1987, (effective August 1, 1987), such that 1003(d) was renumbered 1003(b). The content of the original subsection, however, remained unchanged. Any references

fact, if any party was hurt by the existence of. the criminal proceedings, it was the government. It received no new information aside from what it had obtained from the efforts of the criminal division. Ironically, if the government had waited until the parallel criminal proceedings had concluded, the government may have benefitted from of the testimony of representatives of the alleged debtors who had invoked the Fifth Amendment, as well as the United States Supreme Court's ruling in *Braswell v. United States*, 487 U.S. 99, 108 S.Ct. 2284, 101 L.Ed.2d 98 (1988). The *Braswell* Court held on June 22, 1988, less than two months after the trial on these involuntary petitions that a representative of a corporation "c[an] not resist [a] subpoena for corporate documents on the ground that the act of production might tend to incriminate him." 487 U.S. at ——; 108 S.Ct. at 2295.

With respect to the alleged debtors' contention that they were unable to defend themselves adequately in the instant proceedings, we note that such an argument only has merit, if any at all, if the outcome of these cases is unfavorable to the debtors. We, therefore, decline to consider this argument as a proper element of the debtors' motion to dismiss.

Accordingly, we find no improprieties in the prosecution of parallel criminal and civil proceedings against the alleged debtors in the instant cases, and deny the debtors' motion to dismiss on this basis. Whether the government acted in "bad faith" by pursuing relief in this Court with a "prosecutorial mind-set" is a different question entirely and must be examined in view of the totality of the circumstances in these cases. We, therefore, defer our examination of the issue of bad faith until we have evaluated the defenses of the alleged debtors to the instant petitions.

THREE CREDITOR REQUIREMENT

The requirements for filing an involuntary petition in bankruptcy may be found in Section 303(b) of the Bankruptcy Code which provides:

(b) An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—

(1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute, or an indenture trustee representing such a holder, if such claims aggregate at least $5,000 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;

(2) if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under section 544, 545, 547, 548, 549, or 724(a) of this title, by one or more of such holders that hold in the aggregate at least $5,000 of such claims[.]

11 U.S.C. §§ 303(b)(1), (b)(2). Under this section, a single creditor may file an involuntary petition "only if the debtor against whom the proceeding is commenced has fewer than twelve creditors." *Basin Electric Power Coop. v. Midwest Processing Co.*, 47 B.R. 903, 907 (D.N.D.1984), *aff'd*, 769 F.2d 483 (8th Cir.1985), *cert. denied*, 474 U.S. 1083, 106 S.Ct. 854, 88 L.Ed.2d 894 (1986). It appears then that how a creditor proceeds with the filing of an involuntary bankruptcy petition must depend in part upon his knowledge of the number of the debtor's creditors.

The extent of the government's knowledge with respect to the number of the debtors' creditors in the instant case is an issue which has been raised several times

---

to Rule 1003(d) in testimony or in cases cited have been left unedited.

Bankruptcy Rule of Procedure 1003(b) provides:
(b) Joinder of petitioners after filing. If the answer to an involuntary petition filed by fewer than three creditors avers the existence of 12 or more creditors, the debtor shall file with the answer a list of all creditors with their addresses, a brief statement of the nature of their claims, and the amounts thereof. If it appears that there are 12 or more creditors as provided in § 303(b) of the Code, the court shall afford a reasonable opportunity for other creditors to join in the petition before a hearing is held thereon.
Bankr.R.P. 1003(b).

since the filing of these petitions. This Court has denied prior motions to dismiss, however, because the evidence before the Court at the time the rulings were issued did not establish conclusively that the government had demonstrated bad faith in the act of filing.[10] This Court also permitted the intervention of other creditors over the objection of the debtors on the same basis.[11]

In response to the debtors' motion to dismiss made on the second day of trial, however, counsel for the government replied in part as follows:

We have never made a secret, Your Honor, as to the Government's knowledge as to potential creditors. If you look, for instance, to the Motion for Appointment of Interim Trustees, we attached the Egan affidavit which debtors have continually pointed to as the evidence of our knowledge. We made no secret of that.

In the motion for treating that Motion for Appointment of Interim Trustees *ex parte* matter we also submit much the same information. We have acknowledged to the Court in open court. Mr. Hudson last summer made that explicit.

Your Honor has observed from the very context of our pleadings that it's no secret and I just don't understand how [opposing counsel] can stand here and straight face (sic) suggest that we in any way hid that point.

It is our contention that if the matters can be waived, then it was our right to file the petition and see what the debtors want to do as far as that potential defense, and then once they elected to controvert the issue, then it is our view that as a procedural affirmative defense, the affirmative predicate is to comply with 1003(d).[12]

Tr. Vol. III, pp. 83–84. In view of the government's clear admission that prior to April 20, 1987 it knew that the debtors each had more than twelve creditors, the issue here is whether this Court should dismiss these involuntary petitions as a matter of law.

The first statutes attempting to establish a uniform system of bankruptcy did not require that a minimum number of creditors file an involuntary petition in bankruptcy under any circumstances.[13] The Bankruptcy Act of 1898, however, provided that *three* creditors were required to file an involuntary petition against a debtor having a total number of more than twelve creditors.[14] The change from earlier stat-

---

**10.** *See* Transcript of Hearing, April 21, 1987, pp. 32–35 (Court treated motion by alleged debtors regarding irregularities in involuntary petition and challenge to jurisdiction as a motion to dismiss and determined that dismissal would not be proper at that time because of lack of information before the Court); Transcript of Hearing, June 15, 1987, p. 24 (Court denied motion to dismiss; Court did not "have any evidence that they kn[e]w there are more than 12[.]").

**11.** On March 2, 1988, this Court granted the motions of several creditors who sought intervention as joint petitioning creditors. *See* Transcript of Hearing, March 2, 1988, pp. 3–5. The Court noted during the hearing that intervention "appears to be a matter of right unless bad faith is shown[.]" Transcript of Hearing on March 2, 1988, p. 4.

**12.** *See supra* note 9 (noting that earlier Rule 1003(d) is the same as present rule 1003(b)).

**13.** *See* Act of 1800, § 2, 2 Stat. 19, 21, ch. XIX (petition properly filed "by any one creditor, or by a greater number"), repealed, Act of December 19, 1803, 2 Stat. 248, ch. VI; Act of 1841,

§ 1, 5 Stat. 440, 442, ch. IX (involuntary bankruptcy proper "upon the petition by one or more of [debtor's] creditors"), repealed, Act of March 3, 1843, 5 Stat. 614, ch. LXXXII; Act of 1867, § 39, 14 Stat. 517, 536, ch. 176 (person "shall be adjudged a bankrupt on the petition of one or more of his creditors"), repealed, Act of June 7, 1878, 20 Stat. 99, ch. 160.

**14.** Section 59 of the Act of 1898 originally provided in pertinent part:

b. Three or more creditors who have provable claims against any person which amount in the aggregate, in excess of the value of securities held by them, if any, to five hundred dollars or over; or if all of the creditors of such person are less than twelve in number, then one of such creditors whose claim equals such amount may file a petition to have him adjudged a bankrupt.

\*    \*    \*    \*    \*    \*

d. If it be averred in the petition that the creditors of the bankrupt are less than twelve in number, and less than three creditors have joined as petitioners therein, and the answer avers the existence of a larger number of

utes reflected the compromise of a "pitched battle between those [in Congress] who wanted to give the creditor an effective remedy to assure equal distribution of a bankrupt's assets and those who were determined to protect the debtor from the harassment of ill-considered or oppressive involuntary petitions, including those by a single creditor interest." *In re Gibraltor Amusements, Ltd.*, 291 F.2d 22, 28 (2d Cir.) (Friendly, J., dissenting), *cert. denied*, 368 U.S. 925, 82 S.Ct. 360, 7 L.Ed.2d 190 (1961).[15] Section 59 of the Bankruptcy Act of 1898 also provided that creditors other than the original petitioners may appear and join the involuntary petition at any time.[16] Its present day counterpart is 11 U.S.C. § 303(c).[17]

Since the Act of 1898, the statutory provisions applicable to the filing of involuntary proceedings have undergone various changes. The minimum requirement of three petitioning creditors to commence a petition against a debtor who has in excess of twelve creditors, however, has remained the same.[18] To better understand the significance of Section 303 of the Bankruptcy Code, we examine its historical development.

The earliest case we have found on the issue of the proper filing of an involuntary petition was decided by the District Court for the Western District of Pennsylvania in *Robinson v. Hanway* in 1879. 20 F.Cas. 1012 (W.D.Penn.1879) (No. 11,953). In *Robinson*, the precise question before the court was whether an original involuntary petition filed by a partnership against one of its partners was valid. *Id.* After the original petition was filed, several creditors intervened, "making of themselves suffi-

creditors, there shall be filed with the answer a list under oath of all the creditors, with their addresses, and thereupon the court shall cause all such creditors to be notified of the pendency of such petition and shall delay the hearing upon such petition for a reasonable time, to the end that parties in interest shall have an opportunity to be heard; if upon such hearing it shall appear that a sufficient number have joined in such petition, or if prior to or during such hearing a sufficient number shall join therein, the case may be proceeded with, but otherwise it shall be dismissed. Act of 1898, §§ 59(b), (d), 30 Stat. 544, 561, ch. 541.

**15.** In *In re Gibraltor Amusements, Ltd.*, Justice Friendly reviewed the legislative history of the three creditor requirement and the debate of that time between the Eastern congressmen and the Populists. 291 F.2d 22, 26–29 (2d Cir.1961) (Friendly, J., dissenting). Justice Friendly noted that while the Easterners were "unwilling to enact a voluntary bill without accompanying involuntary features designed to insure an equitable distribution of a bankrupt's assets[,]" the Populists perceived the involuntary bankruptcy mechanism as "a weapon in the hands of the creditor to press collections of debt harshly, to intimidate, and to destroy." 291 F.2d at 27 (quoting Rep. Parker, N.J., 31 Cong.Rec. 1852; Rep. Lewis, Ga., 31 Cong.Rec. 1908, respectively). Justice Friendly observed that the "provisions of the statute with respect to involuntary procedures were the resulting vector of these opposing forces, an attempt to make involuntary bankruptcy less unpalatable to the Populists by surrounding such proceedings with careful safeguards for the debtor." 291 F.2d at 27–28; *see also In re Coburn*, 126 F. 218, 220

(D.Mass.1903) ("Congress has seen fit to require in most cases that three creditors shall join in order to make an involuntary petition effective, and this provision may well have been inserted in the law because Congress thought it inadvisable that one or two creditors, however important, should be permitted to put a debtor into bankruptcy against the wish of all other creditors."), *aff'd*, 131 F. 201 (1st Cir.1904).

**16.** Section 59(f) of the Bankruptcy Act of 1898 provided:

f. Creditors other than original petitioners may at any time enter their appearance and join in the petition, or file an answer and be heard in opposition to the prayer of the petition.

Act of 1898, § 59(f), 30 Stat. 544, 562, ch. 541.

**17.** Section 303(c) of the Bankruptcy Code provides:

(c) After the filing of a petition under this section but before the case is dismissed or relief is ordered, a creditor holding an unsecured claim that is not contingent, other than a creditor filing under subsection (b) of this section, may join in the petition with the same effect as if such joining creditor were a petitioning creditor under subsection (b) of this section.

11 U.S.C. § 303(c).

**18.** *See* 11 U.S.C. § 303(b), *supra* text at 12–13; *see also* 11 U.S.C. § 303(c), *supra* note 17 (allowing creditors to intervene in involuntary petition); Bankr.R.P. 1003(b), *supra* note 9 (requiring debtors to file a list of creditors if total number of creditors is controverted, and providing an opportunity for creditors to intervene).

cient in number and amount to constitute the quorum required[.]" *Id.* at 1013.

The *Robinson* court observed that under common law "no action could be sustained by a partnership firm against one of its members," and no statute had since been passed to authorize this practice. *Id.* at 1012. The court concluded, therefore, that the:

> original creditors' petition is void for want of proper petitioners, and did not give the court jurisdiction of the case, and that the intervening petitions are also void for want of an original petition to give them force. It is not a case of amendment of a defective petition of which the court has jurisdiction, and when the interveners perfect the petition by additional numbers and amounts. But it is an attempt to give life to a dead petition ... The intervenors must draw their support, if at all, from the original petition; but in this case the original petition is dead, and neither supports the interveners nor itself.

*Id.; see also Despres v. Galbraith,* 213 F. 190, 193 (8th Cir.1914) (original petition void for want of proper petitioner and therefore intervening petitioners could not draw support from original filing).

A decision seemingly contrary to the decision in *Robinson* later was rendered by the District Court for the District of Massachusetts in *In re Romanow.* 92 F. 510 (D.Mass.1899). In *Romanow,* several of the creditors who had filed an involuntary petition had assented to a general assignment, the act of bankruptcy upon which the petition was based. *Id.* at 511. Subsequent to the filing, several creditors intervened and opponents of the petition maintained that in view of the petitioning creditors' assent to the assignment, the petition could not be sustained. *Id.* at 511–12.

Moreover, the opponents alleged, if the petition were allowed to stand because of the *intervening* petitions, "[t]his practice ... would permit a petition, at the time of its filing insufficient in substance as well as in form, to be made good by subsequent acts." *Id.* at 511. The *Romanow* court admitted that there was "weight in this argument, but [also noted that] the language of the act is clear; and the inconvenience, if inconvenience there be, was not deemed by congress a controlling consideration in the act of 1867 ... nor in some cases, at least, under the act of 1898[,]" and allowed the other creditors who had intervened to retain their standing as petitioning creditors. *Id.* at 511–12.

The District Court for the Northern District of Georgia subsequently reasoned in *In re Bedingfield,* 96 F. 190 (N.D.Ga.1899), however, that the *Romanow* court spoke only to the situation in which an involuntary petition was sufficient on its face upon its filing and at some time prior to adjudication it was established that certain creditors "did not have debts, or their debts were not provable," a situation in which other creditors could intervene to correct any defects. *Id.* at 192. The *Bedingfield* court emphatically stated that:

> [t]he court would never entertain a mere sham petition prepared originally with a view to doing this, but it would be only where a petition was brought in good faith, and some such contingency as has been referred to occurred.

*Id.*

It is indicated from the above referenced cases and others which have followed that courts historically have attempted to distinguish between a petition "sufficient" and "insufficient" on its face at the time of its filing,[19] and between petitioners with bona

19. *Compare In re Mackey,* 110 F. 355, 362 (D.Del.1901) (permitting solicitation of other creditors to join involuntary petition after court determined petitioning creditors did not have total amount of claims necessary, because petition contained necessary averments and court had jurisdiction over original petition) *and In re Gillette,* 104 F. 769, 775 (W.D.N.Y.1900) (permitting time for petitioning creditor to surrender preference obtained or intervention of other creditors to sustain petition in which three creditors were required for filing) *with Manning v. Evans,* 156 F. 106, 109 (D.N.J.1907) (petition filed was insufficient on its face; therefore, intervening creditor did not validate original petition; petition valid as of intervention date) *and In re Stein,* 130 F. 377, 378 (E.D.Pa.1904) (denying amendment of original petition where original petition avers less than statutory amount, despite the existence of other creditors wishing

fide and fraudulent motives.[20] Only with the former, in each instance, were petitioners permitted to amend the original filing to add creditors who sought intervention and cure the original defect.

Once the above rules of law emerged from the courts, parties began to focus more specifically on the mechanics of filing the involuntary petition itself. *See In re Coburn*, 126 F. 218, 219 (D.Mass.1903) (determining how and when to calculate the number of the debtor's creditors), *aff'd*, 131 F. 201 (1st Cir.1904), *cert. denied*, 196 U.S. 640, 25 S.Ct. 796, 49 L.Ed. 631 (1905); *W.A. Gage & Co. v. Bell*, 124 F. 371, 380 (W.D. Tenn.1903) (determining what information the "list of creditors" filed in response to a petition should contain); *see also In re Berkebile*, 144 F. 572, 576 (W.D.N.Y.1905) (indicating that objection to involuntary petition may be waived); *In re Plymouth Cordage Co.*, 135 F. 1000, 1003–05 (8th Cir.1905) (determining that failure to allege the total number of the debtor's creditors was not fatal to court's jurisdiction over petition).

Despite efforts by courts to clarify the procedure for filing involuntary petitions, however, debtors and creditors alike continued to attempt to manipulate the status of claims to defeat or accomplish a proper filing. *See Moulton v. Coburn*, 131 F. 201, 204–05 (1st Cir.1904) (creditors assigned claims to voluntary assignee to reduce number of creditors to sustain involuntary petition by less than three creditors; court held that upon a petition by less than three creditors it must appear that the debtor had less than twelve creditors on the date of filing), *cert. denied*, 196 U.S. 640, 25 S.Ct. 796, 49 L.Ed. 631 (1905); *Leighton v.*

*Kennedy*, 129 F. 737, 741 (1st Cir.1904) (bankrupt made general assignment to one creditor who reassigned claim to twelve creditors to defeat sole creditor petition; court determined debtor intended to defeat scheme of bankruptcy statute and petitioning creditors' statutory right to file involuntary petition); *In re Branche*, 275 F. 555, 557 (N.D.N.Y.1921) (where debtor named as creditors individuals whose bills were payable monthly to increase total number of claim holders beyond twelve to defeat single creditor petition, court noted "[m]ere schemes and artifices to avoid letter and spirit of law will not be tolerated"); *In re Blount*, 142 F. 263, 263–64 (E.D.Ark. 1906) (debtor transferred property for benefit of all but three creditors, but preferred creditors remained "unpaid" to ensure their inclusion in the total creditor count).

In *Canute S.S. Co. v. Pittsburgh & West Virginia Coal Co.*, 263 U.S. 244, 44 S.Ct. 67, 68 L.Ed. 287 (1923), the United States Supreme Court addressed several of the issues pertaining to the proper filing of an involuntary bankruptcy which had been the focus of litigation at that time. In *Canute*, three creditors filed an involuntary petition in bankruptcy. 263 U.S. at 245, 44 S.Ct. at 67. The bankrupt denied the allegations of the petition, and several creditors were granted leave to intervene. *Id.* at 245–46, 44 S.Ct. at 67–68. Prior to adjudication, several creditors sought intervention to *oppose* the petition, but the bankrupt withdrew its objection to the petition and consented to an adjudication on the merits of the original creditors' petition. *Id.* at 246, 44 S.Ct. at 68. The opposing creditors appealed the lower court's decision to permit

---

to join on the basis that relevant case law showed amendments to petition allowed only where original petition contained necessary averments required by act); *accord In re Diamond Fuel Co.*, 283 F. 108, 109 (2d Cir.1922) (contrasting petition jurisdictionally defective for failing to plead act of bankruptcy in proper form, and petition which merely lacks evidence of "proof" of number of bona fide creditors), *aff'd*, 263 U.S. 244, 44 S.Ct. 67, 68 L.Ed. 287 (1923).

**20.** *Compare In re Mammouth Pine Lumber Co.*, 109 F. 308, 311 (W.D.Ark.1901) (allowing creditors to join petition in which certain petitioning

creditors were disqualified, in view of fact that there were no allegations that original petitioners were "sham creditors") *and In re Mercur*, 95 F. 634, 635 (E.D.Pa.1899) (creditors permitted to intervene in petition filed by sole creditor against bankrupts having more than twelve creditors) *with In re Burlington Malting Co.*, 109 F. 777, 780 (E.D.Wis.1901) (time had been provided to allow intervention of creditors to validate petition filed by sole creditor; intervention ultimately denied upon determination that claims of two creditors were purchased by original petitioner creating "obvious subterfuge").

the intervention of several creditors, claiming that the original petition was defective and could not be cured. *Id.* The district court determined *inter alia* that the intervening creditors had cured any defect in the original petition, and the court of appeals affirmed. *Id.*

On appeal to the Supreme Court, the opposing creditors maintained that to give a court jurisdiction over an involuntary petition it must be filed by not less than three creditors having provable claims, unless the creditors are less than twelve in number; and, where less than three of the original creditors qualify, the joinder of intervening creditors is in substance an amendment but in effect the equivalent to a new filing. *Id.* at 247–48, 44 S.Ct. at 68. The appellants further maintained that such an amendment could not validate the original petition *ab initio* or authorize an adjudication of bankruptcy to be made thereunder, for such an adjudication would be based upon an act committed more than four months prior to the date on which the requisite number of creditors entitled to maintain the action had become petitioners. *Id.* at 248, 44 S.Ct. at 68.

The United States Supreme Court in *Canute* observed that the argument of the opposing creditors that the creditors who sustain the petition must in fact be the original petitioners, failed to give weight to Section 59 of the Bankruptcy Act, which allowed creditors to intervene in an involuntary petition at any time until a dismissal or an adjudication on the merits. *Id.* Consequently the Supreme Court concluded:

> that where a petition for involuntary bankruptcy is sufficient on its face, alleging that the three petitioners are creditors holding provable claims and containing all the averments essential to its maintenance, other creditors having provable claims who intervene in the proceeding and join in the petition at any time during its pendency before an adjudication is made, after as well as before the expiration of four months from the alleged act of bankruptcy, are to be counted at the hearing in determining whether there are three petitioning creditors qualified to maintain the petition, it

> being immaterial in such case whether the three qualified creditors joined in the petition originally or by intervention.

*Id.* at 249, 44 S.Ct. at 68.

The Supreme Court's opinion in *Canute*, while clarifying the issue of a court's jurisdiction over an involuntary petition sufficient on its face, expressly noted that the "question, upon which the decisions show a conflict of opinion, as to the joinder of an intervening creditor in an original petition insufficient upon its face, is not here involved and is not determined." *Id.* at 250, 44 S.Ct. at 69.

The first to address the issue left open by the Supreme Court's decision in *Canute* was the First Circuit in *Myron M. Navison Shoe Co. v. Lane Shoe Co.*, 36 F.2d 454 (1st Cir.1929). In *Navison Shoe*, a single creditor filed an involuntary petition based on the allegation that the alleged bankrupt had less than twelve creditors. In its response, the debtor admitted the act of bankruptcy alleged but maintained that the

> allegation of the petition as to the number of creditors (setting out the facts) was false, and was fraudulently inserted in the petition, with the purpose of circumventing the provisions of the Bankruptcy Act, and that the petitioner did not come into court with clean hands.

36 F.2d at 455.

The petition and answer were submitted to a special master for review who concluded that prior to the filing, Navison Shoe, the alleged bankrupt, made a general assignment for the benefit of its creditors, and that on the date of the filing, the alleged bankrupt had 29 creditors who had not assented to the assignment. *Id.* The master noted, however, that *after* the petition was filed, several of the claims were purchased by Joseph Navison, beneficial owner of all of the stock of Navison Shoe Co., and his nominees, and that several individuals could not be counted as creditors in view of the nature of their claims. *Id.* at 456.

With respect to the petitioner's knowledge of the debtor's other creditors, the master observed that prior to the filing, the

petitioning creditor had examined the bankrupt's books and records. *Id.* The master also noted that correspondence and answers to interrogatories revealed that the debtor in fact had more than twelve creditors. *Id.* The master, however, found that there was "no evidence that [counsel for the petitioning creditor] *believed* that there were this number of creditors." *Id.* (emphasis supplied). The master ultimately ruled that Navison Shoe had less than twelve creditors who could qualify as petitioning creditors, and, therefore, the petition was proper and an adjudication could be made. *Id.* The District Court approved the master's recommendation and ordered adjudication. *Id.*

On appeal, the First Circuit cited as "wholly immaterial" what the petitioning creditor's counsel "believed," and identified the material question "to be what the Lane Shoe Company *knew, or should have known and believed,* on the date it filed its petition ... having previously received the information that it had." *Id.* (emphasis supplied).

At the outset of its analysis the First Circuit in *Navison Shoe* noted that an allegation regarding the number of an alleged bankrupt's creditors must be verified in accordance with the number of creditors existing on the date the involuntary petition is filed. *Id.* at 456–57. On the facts of the *Navison Shoe* case there were 28 creditors, and no other creditors had intervened; therefore, the First Circuit determined the "order of adjudication was improper, unless some valid reason, disclosed by the facts found by the master require[d] a different conclusion." *Id.* at 457.

The *Navison Shoe* court noted that the question posed had been addressed previously by the circuit in *Moulton v. Coburn,* 131 F. 201 (1st Cir.1904), *cert. denied,* 196 U.S. 640, 25 S.Ct. 796, 49 L.Ed. 631 (1905). *Id.* at 458. The First Circuit in *Moulton* established that while the Bankruptcy Act grants intervening creditors the right to proceed as parties to a petition, there is no evidence in the statute that rights not in existence at the time of filing can be made effective thereunder, or that a sole petition

which alleges falsely that the debtor has less than twelve creditors can be validated later by a reduction in the number of eligible creditors. 131 F. at 204–05; *see* 36 F.2d at 459.

The court in *Navison Shoe* then indicated that there was:

> a further ground upon which ... the creditor's petition should . be dismissed, and that is, that the conclusion to be drawn from the primary facts found by the master is clear—that the Lane Shoe Company, on November 10, 1928, when it filed the petition, in which it alleged that the creditors of the Navison Shoe Company, Inc., were less than twelve, did so knowing that the allegation was false; or did so recklessly not caring whether the allegation, which it affirmed as of its own knowledge to be true, was true or false, and, being false, its conduct was a fraudulent attempt to confer jurisdiction upon the court, where none existed....
>
> . . . .
>
> ... It is incredible that the petitioner did not believe the information that had been given it, or, having such information, did not suspect what it affirmed in its petition to be true was false, in which event its conduct would be fraudulent, for one cannot affirm as of his own knowledge a thing to be true, intending it to be relied upon, if he suspects it to be false, without being guilty of fraud. [citation omitted] A person who suspects his statement is false does not entertain an honest belief it is true, or is consciously and wickedly indifferent to its truth or falsity.

36 F.2d at 459.

Thus, *Navison Shoe* clarified that a petition which fails to aver the total number of the debtor's creditors, or is mistaken on this point is indeed "sufficient on its face" for the purpose of invoking the court's jurisdiction, (assuming that it contains the averments necessary to sustain an adjudication on the merits), but that a court should not retain jurisdiction over an involuntary proceeding initiated by a single creditor who intentionally or recklessly

files a petition against a debtor who had more than twelve creditors.

The First Circuit's decision in *Navison Shoe* reflects the underlying principle evident since the earliest decisions on involuntary bankruptcy petitions, which is the duty of a court to enforce compliance with the provisions of bankruptcy statutes. *Accord In re Blount,* 142 F. 263, 265 (E.D. Ark.1906) ("The duty of the courts is to carry this intention of Congress [to secure equal distribution] to the extent which the language of the act justifies. Mere schemes and artifices to avoid the letter and spirit of the law will not be tolerated."); *Leighton v. Kennedy,* 129 F. 737, 741 (1st Cir.1904) ("An attempt ... to defeat the scheme of the [involuntary bankruptcy] statute, is unlawful and void, and so clearly so that we need not elaborate the proposition."). The rule of law as expressed by the Seventh Circuit in *In re Crofoot Nielsen & Co.* in 1963 was that:

> if a single creditor files a petition with knowledge that the allegation (less than twelve creditors) is false, the petition will be dismissed as a fraudulent attempt to confer jurisdiction where none exists and intervention 'presumably' will be denied.

313 F.2d 170, 171 (7th Cir.1963) (citations omitted).

It was the First Circuit's decision in *In re Crown Sportswear, Inc.,* which modified slightly the developing trend by discussing its ruling in terms of "bad faith," in addition to fraud. 575 F.2d 991 (1st Cir.1978). In *Crown Sportswear,* a sole petitioning creditor alleged that the debtor had fewer than twelve creditors in its involuntary petition. *Id.* at 992. The debtor filed a motion to dismiss on the basis that "since it had more than eleven creditors, the bankruptcy court had no jurisdiction over the petition." *Id.* The bankruptcy court determined that the "allegation of fewer than twelve creditors was not made in bad faith, nor was the conduct of the petitioner's attorney reckless[,]" and the district court affirmed. *Id.*

To the *Crown Sportswear* court, it was "obvious" that the Bankruptcy Act anticipated the situation in which sole creditors were mistaken as to the number of a debtor's creditors, and that the emphasis of the statute was not the "correctness of the originating petition." *Id.* at 993. Moreover, the court found no authority indicating that a "cursory investigation amount[ed] to bad faith as a matter of law." *Id.* The First Circuit distinguished its prior holding in *Navison Shoe* on the basis that the petitioning attorney in *Navison* was informed several times prior to the bankruptcy proceedings that there were more than thirty creditors. *Id.* at 993–94. The court in *Crown Sportswear* also acknowledged the proposition stated in *In re Crofoot Nielsen,* that a fraudulent filing will result in a dismissal, but ultimately determined that the facts before it were more analogous to those in *In re Security Motor Co.,* 51 F.Supp. 559 (W.D.Mo.1943), a case in which the court did not find bad faith upon the filing of an involuntary petition by a single creditor because it was not "the usual case of fraud and deceit." *Id.* at 994; *see* 51 F.Supp. at 561.[21]

---

21. In *In re Security Motor Co.,* an alleged debtor responded to an involuntary petition filed by a single creditor by stating "that the number of its creditors was far in excess of twelve and that the petitioning creditor knew this when it filed its petition and that, therefore, the petition was filed in bad faith." 51 F.Supp. 559, 559 (W.D. Mo.1943). The special master determined that the petitioning creditor "neither fraudulently nor recklessly made the averment, and that even though there were far more creditors than the minimum alleged by the petitioning creditor, yet others had joined, and that the bankruptcy petition was invulnerable to attack." *Id.* In affirming the master's ruling the district court observed that:

> [a] careful reading of all of [11 U.S.C.] Section 95 shows that it was contemplated by the Congress that a single qualified petitioning creditor might reasonably be *mistaken* in an averment that there were less than twelve creditors in order to qualify such petitioner for instituting a bankruptcy proceeding. By paragraph d [of 11 U.S.C. § 95] the answer of the alleged bankrupt might disclose a large number of creditors. In such event it was not contemplated that the petition should be dismissed but that the sole creditor might be joined by a sufficient number of other qualified creditors so as to warrant the further proceeding in bankruptcy.

*Id.* at 560–61 (emphasis supplied). The district court further noted that under paragraph e of

The *Crown Sportswear* court concluded its opinion by responding to the debtor's allegation that in making an inaccurate allegation regarding the number of the debtor's creditors, the petitioning creditor had violated Bankruptcy Rule 911, which required that a pleading or motion be filed in good faith. 575 F.2d at 994.[22] The court noted that the debtor had attempted to proffer testimony on the issue of whether the creditor knew or should have known that the debtor had in excess of twelve creditors, but the bankruptcy court excluded the evidence and no objection was made. *Id.* The First Circuit agreed that the "rule requires that a pleading or motion must be filed in good faith[,]" but ultimately concluded that there was no such proof on the issue. *Id.* After *Crown Sportswear,* many courts addressing the situation in which a petitioning creditor failed to make a due investigation of the number of the debtor's creditors, or knew or should have known that the debtor had more than twelve creditors, have couched their analyses in terms of good faith.[23]

The most recent decision directly addressing the issues attendant to a proper filing of an involuntary petition by a single creditor is the Eighth Circuit's decision in *Basin Electric Power Coop. v. Midwest Processing Co.,* 769 F.2d 483 (8th Cir.1985), *cert. denied,* 474 U.S. 1083, 106 S.Ct. 854, 88 L.Ed.2d 894 (1986). In *Basin Electric,* a sole petitioning creditor filed an involuntary petition and shortly thereafter, two creditors intervened. 41 B.R. 90, 96–97 (Bankr.D.N.D.1984). The debtor alleged *inter alia* that the petition was filed in bad faith because the petitioning creditor knew that the debtor had more than twelve creditors. *See id.* at 102. The bankruptcy court observed, however, that the debtor could not argue that the petitioning creditor knowingly included false allegations in the petition because the creditor had avoided making *any* allegations regarding the number of the debtor's creditors in the involuntary petition. *Id.* at 103. Consequently, the bankruptcy court found that it could not find "bad faith merely from the conduct of Basin Electric wherein it filed the involuntary petition with knowledge

11 U.S.C. § 95, a number of individuals identified by the bankrupt as creditors were ineligible to be petitioning creditors, "so that it is questionable in any case but that a sole petitioning creditor would find justification in an averment that the number of creditors lawfully considered were less than twelve." *Id.* at 561. In view of the absence of evidence establishing the creditor's fraud and deceit, the district court concluded that involuntary proceedings should be terminated only on the basis of evidence "which shows beyond dispute that the court's jurisdiction was willfully imposed upon." *Id.*

**22.** Bankruptcy Rule of Procedure 911, now Bankruptcy Rule 9011, tracks Federal Rule of Civil Procedure 11. *See* Bankr.R.P. 9011, *infra* at 924.

**23.** *See In re American President Lines, Ltd.,* 804 F.2d 1307, 1309 n. 2 (D.C.Cir.1986) (noting in dicta the "good faith" exception that some courts recognize to the three creditor requirement wherein creditors who act under good faith but mistaken belief that debtor has less than twelve creditors may amend petition); *In re Coppertone Communications, Inc.,* 96 B.R. 233, 236 (Bankr.W.D.Mo.1989) (essential prerequisite for allowing additional creditors to join to cure a defective petition is that the original petition was filed in good faith); *In re McDonald Trucking Co., Inc.,* 74 B.R. 474, 479

(Bankr.W.D.Pa.1987) (petitioning creditor's deliberate omission of statement regarding the number of debtor's creditors is itself a "measure of [the petitioning creditor's] intent and is sufficient to reach a finding of bad faith."), *motion for reconsideration denied,* 76 B.R. 513 (Bankr. W.D.Pa.1987); *In re Alta Title Co.,* 55 B.R. 133, 137 (Bankr.D.Utah 1985) (essential prerequisite for allowing joinder of additional creditors to cure defective petition is that original petition must have been filed in good faith); *In re Godroy Wholesale Co.,* 37 B.R. 496, 500 (Bankr.D. Mass.1984) (a single creditor may not commence involuntary proceeding without due investigation and escape a bad faith finding); *In re Earl's Tire Serv., Inc.,* 6 B.R. 1019, 1022 n. 9 (D.Del.1980) (noting in dicta that debtor is entitled to have involuntary petition dismissed if debtor opposes petition and shows that single petitioning creditor fraudulently or in bad faith has alleged that debtor has more than twelve creditors); *In re Rite–Cap, Inc.,* 1 B.R. 740, 741 (Bankr.D.R.I.1979) (essential prerequisite prior to joinder is that petition must be filed in good faith; if original petition was a sham, prepared with view of later being supported by creditors, joinder should be denied); *Cf. In re Trans–High Corp.,* 3 B.R. 1, 3–4 (Bankr.S.D.N.Y.1980) (implying that timely intervention by other creditors may negate bad faith of sole petitioning creditor who filed improperly).

that it needed two additional supporting petitioners." *Id.*

On appeal, the district court independently examined the three creditor requirement imposed under Section 303 of the Bankruptcy Code, and the allegations of bad faith. *See* 47 B.R. 903, 907–09 (D.N.D. 1984); 11 U.S.C. § 303, *supra* text at 12–13. In its review of the record, the district court observed that the debtor had 100 creditors and that the petitioning creditor had "simply ignored the three creditor requirement of § 303(b), even though [it] knew that [the debtor] had twelve or more creditors." 47 B.R. at 907–08.

Addressing the bankruptcy court's decision to allow other creditors to join the petition, the district court stated:

> Despite the liberal joinder envisioned under § 303(c), the three creditor requirement of § 303(b) would be rendered meaningless if subsequent joinder of additional parties were sufficient in all cases where fewer than three creditors originally commenced an involuntary case against a debtor who has twelve or more creditors. Section 303(c) may properly be invoked where a single petitioning creditor is unaware that a debtor has twelve or more creditors. But where, as in this case, a single creditor commences an involuntary case despite knowledge that the debtor has twelve or more creditors, the petition is deficient and should be dismissed absent special circumstances.

*Id.* at 908. The district court ultimately concluded that the "bankruptcy court erred in not dismissing [the creditor's] petition against [the debtor] for failure to meet the three creditor requirement of § 303(b)." *Id.*

To evaluate the allegations of bad faith, the district court considered the creditor's subjective motives for filing, in addition to whether a reasonable person in the position of the petitioning creditor would have filed the petition. *Id.* at 909. The district court ultimately concluded that the bankruptcy court *also* erred in not dismissing the petition by reason of the petitioning creditor's bad faith. *Id.* at 910.

On appeal to the Eighth Circuit, it appears that the petitioning creditor challenged only the lower court's finding of bad faith and argued that "because the three creditor requirement is not jurisdictional and may be waived, [citations omitted], it did not act in bad faith by knowingly filing a deficient petition that omitted reference to the number of [the debtor's creditors]." 769 F.2d at 485. The Eighth Circuit found with respect to the filing, however, that:

> [a]ccepting appellant's argument would circumvent unduly the three creditor requirement of section 303(b). The three creditor requirement is not a meaningless formality that a creditor may ignore until after filing the involuntary petition. While an involuntary petition may be cured after filing when a single creditor files in good faith believing the debtor has fewer than twelve creditors, a single creditor may not file an involuntary petition knowing the debtor has twelve or more creditors....

> ....

> ... Basin Electric knew that Midwest Processing had twelve or more creditors and intentionally filed a deficient petition. Merely because the defects were subject to waiver does not excuse the intentional filing of a defective petition.

> The three creditor requirement is designed to prevent use of involuntary bankruptcy proceedings by creditors as a means of harassing an honest debtor. [citations omitted]. If the three creditor requirement is to have any legal significance, it may not be knowingly circumvented with an eye to adding other creditors later on.

*Id.* at 486–87.

■ Although the district court and the court of appeals in *Basin Electric* did not cite an historical basis for their analyses, it is clear that their opinions are well-supported by the decisions we have reviewed above. Courts consistently have attempted to uphold the integrity of the bankruptcy statutes, and more specifically the three creditor requirement. While it has long been established that a defective petition

may be amended, or a particular defect waived, the *intentional* violation of a statute has never been ignored; for to allow such conduct would render the statute meaningless and creditors could file involuntary petitions as they did prior to 1898. We, therefore, concur with the ultimate holding of the Eighth Circuit that an involuntary petition filed by a single creditor with the knowledge that the debtor had in excess of twelve creditors must be dismissed, and adopt the approach of the district court in *Basin Electric,* and which analyzed the issue of the intentional filing of a deficient petition independently from the issue of bad faith.

The issue of whether a sole petitioning creditor intentionally and knowingly filed a deficient involuntary petition in bankruptcy is a limited one. If the alleged debtor establishes that the creditor knew that the debtor had in excess of twelve creditors and filed as a sole creditor nevertheless, the appropriate result is the dismissal of the involuntary petition.[24] *See In re Rush,* 10 B.R. 526, 527 (Bankr.N.D.Ala.1981) (if issue of fraud or other bad faith is determined by Court against original petitioners, petition and case instituted thereon should be dismissed, regardless of later intervention of creditors); *In re Earl's Tire Serv., Inc.,* 6 B.R. 1019, 1022 n. 9 (D.Del.1980) (stating in dicta that assuming sole creditor filed with knowledge that debtor had more than twelve creditors, debtor could have obtained dismissal of petition); *In re Trans–High Corp.,* 3 B.R. 1, 4 (Bankr.S.D. N.Y.1980) (noting that courts have "imposed the sanction of dismissal of the petition as a sort of punitive measure."); *In re Herriott,* 1 Bankr.Ct. Dec. (CRR) 793, 794 (Bankr.D.Mass.1975) (if allegation that debtor had less than twelve creditors is found to have been made in bad faith, recklessly, or fraudulently, the court lacks jurisdiction and therefore the involuntary petition must be dismissed and there is nothing in which other creditors can intervene); *accord Securities & Exch. Comm'n*

*v. United States Realty & Improvement Co.,* 310 U.S. 434, 457–58, 60 S.Ct. 1044, 1054, 84 L.Ed. 1293 (1940) (noting long practice of bankruptcy courts to permit parties in interest to assert, whether on strictly jurisdictional grounds or not, that the proceeding should not be allowed to proceed); *In re Ettinger,* 76 F.2d 741, 742 (2d Cir.1935) ("[I]t is the duty of the court, *sua sponte,* when it believes its jurisdiction may have been imposed upon, to inquire into the facts and act in accordance therewith."); *In re Harvey Probber, Inc.,* 44 B.R. 647, 651 (Bankr.D.Mass.1984) (citing decisions which have sanctioned *sua sponte* dismissals); *In re Century City, Inc.,* 8 B.R. 25, 29 (Bankr.D.N.J.1980) (power of court to dismiss case *sua sponte* when its jurisdiction has been improperly invoked is inherent in the bankruptcy court as a court of equity, guided by equitable doctrines and principles); *In re Fast Foods Properties, Ltd.,* 5 B.R. 539, 540 (Bankr.C.D.Cal. 1980) ("a court of bankruptcy has always had the inherent power to dismiss a case which imposed upon its jurisdiction."); *In re Northwest Recreational Activities,* 4 B.R. 36, 39 (Bankr.N.D.Ga.1980) (good faith is merged with power of court to protect its jurisdictional integrity from petitioners seeking to circumvent jurisdictional restrictions and from petitioners with demonstrable frivolous purposes absent any economic reality); *In re Saint Matthew Lutheran Church of Irvine, CA,* 6 Bankr.Ct. Dec. (CRR) 578, 579 (Bankr.C.D. Cal.1980) (bankruptcy court has always had inherent power to dismiss a case which imposed upon its jurisdiction).

We acknowledge that the instant situation differs slightly from those prior in which petitions were dismissed, in that the petitions at hand are indeed sufficient on their face, thereby invoking the jurisdiction of this Court, and that the government did not make a "fraudulent statement" regarding the number of the debtors' creditors. We note, however, that it is precisely because the jurisdiction of this Court may be

---

**24.** We address here only the situation in which the petitioning creditor "knew" that the debtor had in excess of twelve creditors, and do not decide whether our holding would apply to a case in which the debtor established only that the sole petitioning creditor "should have known."

invoked so easily, thrusting an unsuspecting debtor into the uncertain status imposed during the "gap" period of an involuntary petition, that this Court has the obligation to determine once a petition is filed whether to *retain* jurisdiction if the circumstances of the filing indicate a dismissal is warranted. Moreover, despite the government's having avoided a finding of actual fraud, by making no statement regarding the number of debtors' creditors, we find the government's deliberate actions and omission of an allegation pertaining to the number of the debtors' creditors to evidence the improper use of the statute and invocation of this Court's jurisdiction.[25]

In contrast to the narrow legal issue of whether a deficient petition intentionally has been filed, the issue of bad faith is factual, *see United States Fidelity & Guar. Co. v. DJF Realty & Suppliers*, 58 B.R. 1008, 1011 (N.D.N.Y.1986) (bad faith in an involuntary petition is a factual issue), and based upon the totality of the circumstances, *see In re Elsub Corp.*, 66 B.R. 189, 193 (Bankr.D.N.J.1986) (existence of bad faith is determined by the totality of the circumstances). It may well be that a creditor who filed an involuntary petition with knowledge that the debtor has more than twelve creditors acted in bad faith, but the two issues are not necessarily one and the same.

It appears that the government's strategy to "file and wait" was in part based upon the fact that a debtor may waive its right to object to a petition filed by an insufficient number of petitioning creditors. *See* Tr. Vol. II, p. 85; *In re Earl's Tire Serv.*, 6 B.R. 1019, 1022 (D.Del.1980) (debtor waived any right it had to object to

---

**25.** Although the government ultimately conceded that it knew that the debtors had in excess of twelve creditors, the government was less than forthright in revealing its actual knowledge.

On April 21, 1987, the day after the petitions were filed, counsel for the alleged debtors argued specifically that the government alone could not file the involuntary cases in view of the references to "numerous creditors" in the petitions. Transcript of Hearing on April 21, 1987, p. 18. In responding, counsel for the government addressed not the issue of the government's actual knowledge, but rather its right to file a petition as a single creditor, and wait for the debtors to state in their answers that they had more than twelve creditors *and* file a list of creditors in accordance with Bankruptcy Rule 1003(b). *Id.* at 42; *see* Bankr.R.P. 1003(b), *supra* note 9. The government noted that until that was done, "there [wa]s no jurisdictional argument to make." Transcript of Hearing on April 21, 1987, p. 43.

On June 15, 1987, United States Attorney Henry Hudson testified:

[T]he Government would be less than candid with the Court if we were to mention to you that we weren't aware or suspect (sic) that there were more than 12 creditors at the time this petition was filed.

Transcript of Hearing on June 15, 1987, p. 21.
The Court at that time formed the following opinion:

[T]he Government concedes that they suspected that there were more than 12 [creditors]. I don't have any evidence that they know there are more than 12, but certainly from their pleadings one would have to draw the inescapable conclusion that they suspect there are more than 12 creditors.

*Id.*, p. 24.
In March of 1988, the government indicated in answers to interrogatories that it "reasonably believed the alleged debtors had other creditors[,]" and that "the documents seized in the October 1986 search do contain what appear to be numerous loan files indicating many creditors." (Responses to Interrogatory No. 4, Interrogatory No. 5, respectively, filed March 15, 1988).

On March 23, 1988, the Court addressed in a telephone conference call between the Court and counsel what the Court believed to be an admission in the answers to the interrogatories:

COURT: In this connection, the government has admitted it, as I understand it, and they can say "No" now if they don't, that the debtor has more than twelve creditors.

MR. SZYBALA: Yes, your Honor, that's been our position at the outset. We have already stated that at the first hearing.

Transcript of Hearing, March 23, 1988, p. 3.
The government did not state affirmatively the extent of its knowledge to the Court until the second day of trial, May 6, 1988. Tr. Vol. III, pp. 83–85 (*see supra* p. 897).
On the basis of the above, the government's actions could be likened to a constructive fraud on the court, wherein the court may infer the fraudulent nature of the government's conduct. *See Kitchen v. Throckmorton*, 223 Va. 164, 171, 176, 286 S.E.2d 673, 676, 679 (1982) (court adopted definition of constructive fraud as a "breach of legal or equitable duty which, irrespective of the moral guilt of the fraud feasor, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests[;]" and determined that administratrix had perpetrated a constructive fraud upon the court).

defects in petition and consent to being adjudicated a bankrupt). Prior to waiving the debtor's defense, however, the reviewing court must establish that the petitioning creditor took reasonable steps to ascertain the number of the debtors' creditors *before* filing the petition. *See In re McIsaac,* 19 B.R. 391, 397 (Bankr.D.Mass.1982). Again, the distinguishing factor which this Court believes is dispositive is that the government at the time of filing knew that the debtors had in excess of twelve creditors, and filed as a single petitioning creditor despite that knowledge.

Also in its defense, the government contends that pursuant to Bankruptcy Rule 1003(b), it had the right to file as a single creditor and wait for the debtors to file lists of their creditors. Bankruptcy Rule 1003(b) Provides that "[i]f the answer to an involuntary petition filed by fewer than three creditors avers the existence of 12 or more creditors, the debtor shall file with the answer a list of all its creditors[.]" Bankr.R.P. 1003(b). Rule 1003(b), however, addresses only the situation in which the sole petitioning creditor unknowingly files a deficient petition, and the debtor's answer then reveals the existence of more than twelve creditors. Rule 1003(b) was not meant to be used as a weapon to "flush out" creditors and force the debtor to assist in the *preparation* of the involuntary petition pending against him. *See In re McDonald Trucking Co., Inc.,* 74 B.R. 474, 479 (Bankr.W.D.Pa.), *motion for reconsideration denied,* 76 B.R. 513 (Bankr.W.D. Pa.1987).[26] Nor do we believe that Rule 1003(b) anticipates reliance by a petitioning creditor who *had* lists of creditors prior to filing, which the government did in this case. *See* Tr. Vol. III, p. 82 (Court noted that government wanted lists of creditors when the government had extensive information regarding the debtors' creditors); *In re Beacon Reef Ltd. Partnership,* 43 B.R. 644, 646 (Bankr.S.D.Fla.1984) ("The Court attaches no importance to the debtor's failure to file a list of creditors under Rule 1003(d), because the petitioning creditor had access prior to trial to the names and addresses of all creditors claimed to have existed as of the date of filing and did not seek to join any of those creditors in his petition.").

The government also gave policy reasons to support its actions. First the government asserted that the debtors' defense to the criminal proceedings has been that the debtors do not in fact owe debts to any party. The government suggested, therefore, that the debtors' defense provided the government with a good faith basis for questioning the actual identity of the debtors' creditors. Tr. Vol. III, p. 84. Secondly, the government asserted that in accordance with the Code and applicable case law, prior to dismissal a court must allow sufficient time for other creditors to join the petition, and other creditors in fact had joined. *Id.,* p. 85. Thirdly, government's counsel noted, "we had a real problem as to whether word would get out what we were going to do, and we made it very clear in that motion, *ex parte* treatment of the interim trustee motion (sic) that it was the secrecy obligation that compelled us to come in and ask for that particular treatment, and I think that is also a proper justification for proceeding as we did." *Id.* p. 86. The above policy arguments, however, go to the issue of whether the petitions were filed in bad faith, a consideration independent from whether the integrity of the three creditor provision must be upheld.

We note that some courts have cited an increased "flexibility" in the provisions of the Code pertaining to involuntary petitions, *see In re CLE Corp.,* 59 B.R. 579, 585 (Bankr.N.D.Ga.1986) ("courts have found a Congressional intent in section 303(h) to grant more flexibility and make it easier to commence involuntary proceed-

---

**26.** In *In re McDonald Trucking Co., Inc.,* the petitioning creditor requested that the debtor supply the names and addresses of unsecured creditors. 74 B.R. 474, 479 (Bankr.W.D.Pa. 1987). The debtors testified that they did not receive the letter until after the involuntary petitions were filed. *Id.* The court found "that even if Movants were in possession of said letter, the Code places no duty upon them to so respond by providing [the petitioning creditor] with the information." *Id.*

ings against debtors"), however, the added flexibility in the involuntary mechanism is reflected in the substantive aspects of Section 303. For example, under the Bankruptcy Act a petitioning creditor was required to establish "[t]echnical and often hard to prove 'acts of bankruptcy'"; the Code has eliminated "acts of bankruptcy" and now requires the petitioning creditor to establish that the "debtor is generally not paying its debts as they become due[.]" 2 *Collier on Bankruptcy* ¶ 303.01 at 303–7 (15th ed.1989); *see In re All Media Properties*, 5 B.R. 126, 135 (Bankr.S.D.Tex.1980) (reviewing changes in § 303 from the Act), *aff'd*, 646 F.2d 193 (5th Cir.1981). Congress, however, has kept the three creditor requirement intact. We, therefore, have no basis to infer that Congress intended the increased "flexibility" to apply to the provision specifying the number of creditors required to commence a petition under the statute. *See In re James Plaza Joint Venture*, 67 B.R. 445, 447 (Bankr.S.D.Tex. 1986) ("Involuntary petitions commenced under 11 U.S.C. Section 303 must be initiated by the correct number of creditors. A single creditor is sufficient to commence an involuntary proceeding if the debtor has fewer than twelve creditors."); *see also* "Involuntary Petitions Under the Code," 97 Banking L.J. 292, 301 (April 1980) (noting that if debtor has more than twelve creditors, involuntary petition "must be executed by at least three petitioning creditors.").

On the basis of the foregoing, we find that the government had actual knowledge that each of the debtors had in excess of twelve creditors on the date the petitions were filed. The government's decision to file the petitions despite that knowledge constituted an improper use of the involuntary bankruptcy statute and consequently an improper invocation of this Court's jurisdiction; we, therefore, dismiss the involun-

tary petitions pending against the three named debtors. We again note that to determine whether the government acted in "bad faith" in filing these involuntary cases, we must examine the totality of the circumstances surrounding the decision to file. We, therefore, proceed at this time to examine the merits of the government's cases against the debtors.

## MONEYED, BUSINESS, OR COMMERCIAL CORPORATION

Even assuming that this Court denied the debtors' motion to dismiss the involuntary petitions, serious questions remain with respect to the merits of the petitions themselves. First, in opposition to the government's filings, the alleged debtors, Fusion and Caucus, claimed that they were not-for-profit corporations, and, therefore, were ineligible for relief under the Code.[27] *See* 11 U.S.C. § 303(a), *supra* note 3. In this Court's opinion on the government's motion for summary judgment, we stated that the debtors must plead and prove the issue of their eleemosynary status. *See Caucus*, 83 B.R. at 929 (citing *In re Johnson*, 13 B.R. 342, 346–47 (Bankr.D.Minn. 1981)). We review below the factors that this Court must consider in its evaluation of this issue.

In *In re Allen University*, the Fourth Circuit considered whether a university could be subject to an involuntary reorganization under chapter 10 of the Bankruptcy Act. *See* 497 F.2d 346, 347 (4th Cir.1974). In accord with its prior ruling in *Hoile v. Unity Life Ins. Co.*, 136 F.2d 133 (4th Cir.1943), the Fourth Circuit noted that the phrase " 'moneyed, business, or commercial corporation' ha[d] acquired a meaning which limit[ed] it to corporations organized for profit[.]" *Id.* at 348. To determine whether the debtor could become subject to an involuntary proceeding, the Fourth Circuit examined its charter of incorporation and its corporate activities.[28] 497 F.2d at

---

**27.** Campaigner Publications, Inc. admitted in paragraph 4 of its answer to the involuntary petition that it is a person against whom an involuntary petition may be commenced.

**28.** In *Hoile,* the Fourth Circuit specifically characterized the petitioning creditors' argument that a corporation is a " 'moneyed, business or

commercial corporation' because of the money and property which it owns and the moneys which it collects and pays out in benefits[,]" as untenable because the phrase by judicial interpretation and reenactment has acquired a meaning which limits it to corporations organized for profit, and the facts in the pending

347–48; *see Hoile v. Unity Life Ins. Co.,* 136 F.2d at 135.

The *Allen University* court noted that the university neither issued capital stock, nor a return of capital to investors outstanding. 497 F.2d at 348. The Fourth Circuit concluded, therefore, that although the university carried on a number of activities, which if standing alone could be perceived to be commercial in nature, such activities did not affect the "institution's main purpose of education." *Id.*

Implicit in the Fourth Circuit's rulings we believe is a position expressly stated by the court in *Schuster v. Ohio Farmers' Co-op Milk Ass'n.,* 61 F.2d 337 (6th Cir. 1932) which explained that:

> where the *chief purpose* of the corporation is to carry on trade or commerce in an established field, and to do this primarily for the financial benefit of those who have joined in its organization and in the conduct of its affairs, there is but little room for doubt that the corporation is a 'business or commercial' one within the intendment of the Bankruptcy Act.

61 F.2d at 338 (emphasis supplied).

Turning to the evidence proffered by Fusion Energy Foundation, we note that the exhibit upon which it primarily relies is its corporate charter. *See* Exh. Z. The charter reflects that Fusion was founded in August 5, 1975 and provides in pertinent part:

> 3. The purposes for which the corporation is to be formed are for scientific, educational and charitable purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1954 and in this connection are:
>
> a. To provide sustained intellectual and financial support and direction to educational and scientific activities directed to the achievement of industrial-scale fusion power, and to initiate and conduct campaigns in its own name to that end.
>
> b. To sponsor and receive studies relevant to scientific and technical strategies for the achievement of a Manhattan Project-type crash program for the development of fusion energy on an industrial scale, and relevant to the economics of fusion-based production.
>
> c. To disseminate the results to government and international officials and bodies, the press, and the population-at-large.
>
> d. To establish liason (sic) with representatives of labor, farms, anti-fission and environmental groups, scientists and other professionals, and governmental and international agencies.
>
> e. To produce, buy, distribute and lease film and related media and material on the nature and necessity of fusion power for the achievement of purposes stated above paragraphs a, b and c.

Exh. Z. In connection with its stated purposes Fusion publishes two journals entitled "Fusion" (Exh. AU), and "International Journal of Fusion Energy," (Exh. AV).

Fusion also proffered the testimony at trial and the affidavit of Stephen O. Dean, president of Fusion Power Associates. Tr. Vol. III, pp. 204–222; Exh. AF. Mr. Dean testified that he had been acquainted with Fusion since 1974, participated in two to three of its conferences, subscribed to Fusion Magazine, (Tr. Vol. III, pp. 208–09), and that the activities of Fusion Energy Foundation "taken as a whole ... are primarily educational in nature and that their purpose is to provide technical information to stimulate ideas to the solution of some of the major problems facing the world." Exh. AF. Fusion also introduced letters from the Internal Revenue Service that referred to its tax exempt status. Exh. CD, CE. Finally, Fusion introduced a letter from the guardian of petitioning creditor, Charles R. Zimmerman, referring to amounts given by Zimmerman to Fusion that were deducted by Zimmerman as charitable contributions. Exh. O; *see also* Orr Deposition at 44–45.

In response to the above, the government proffered the affidavit of Agent Egan

---

case show that the debtor corporation was organized under the South Carolina statute 'for the mutual benefit of its members and their beneficiaries and not for profit.'

136 F.2d at 135.

of the Federal Bureau of Investigation (FBI), alleging that Fusion engaged in commercial activities (Exh. 41, p. 1); an internal document indicating that Fusion produced a magazine which had a circulation of 45,000, and sold at a set price of $20 (Exh. 46); and several documents seized from a location allegedly occupied by the debtors (hereinafter "internal documents"), which revealed that Fusion used accounting methods, based upon an income, expense, and profit analysis, to manage its operations (Exhs. 45, 63, 72, 108, 118).[29] The government also challenged on cross-examination, the testimony of Mr. Dean by eliciting that he was not familiar with the financial composition of Fusion. In its post trial memorandum, the government also questioned the significance of the tax exempt status in view of the dependence of the Internal Revenue Service upon the debtor for information. Post Trial Memorandum of the Government, p. 33.

While the government has proffered the larger number of exhibits on this issue, they do not, taken individually or as a whole, outweigh the evidence proffered by Fusion. First, the affidavit of FBI Agent Egan proffered by the government was executed to support the issuance of a search warrant. While this Court determined the exhibit to be admissible, we conclude that the probative value of the agent's affidavit with respect to the issue of the debtor's eleemosynary status is minimal.

The government cites a number of cases in which the findings of agencies may be accepted to establish the truth of the matter asserted. Those cases, however, all involved agency personnel who drew conclusions based upon personal knowledge, factual inquiries, or hearings involving interested parties. *See Ellis v. International Playtex, Inc.*, 745 F.2d 292, 301, 304 (4th Cir.1984) (district court erred in excluding epidemiological studies of toxic shock syndrome made by Federal Center for Disease

Control; noting report contained "factual findings" compiled with "professional impartiality"); *In re Japanese Electronic Products*, 723 F.2d 238, 268 (3d Cir.1983) (reports prepared by United States Treasury Department pursuant to duty imposed under 1921 Dumping Act admissible under Federal Rule of Evidence 803(8)(C); court noted that during investigation parties were represented by counsel and had opportunity to make written submissions and oral arguments), *rev'd on other grounds*, 475 U.S. 574, 580, 106 S.Ct. 1348, 1352, 89 L.Ed.2d 538 (1986); *Hodge v. Seiler*, 558 F.2d 284, 288–89 (5th Cir.1977) ("Final Investigation Report" prepared by investigator for agency of Housing and Urban Development reciting facts in narrative form was admissible); *Diaz v. United States*, 655 F.Supp. 411, 416–17 (E.D.Va.1987) (report compiled by navy officer charged to investigate slip and fall of business invitee aboard naval vessel admitted because report was timely, no special skill was required of author and report was routinely prepared as a candid recitation of facts); *Baker v. Elcona Homes Corp.*, 588 F.2d 551, 558 (6th Cir.1978) (policeman's conclusion in accident report held admissible because report was timely, author was skilled and impartial) *cert. denied*, 441 U.S. 933, 99 S.Ct. 2054, 60 L.Ed.2d 661 (1979); *Melville v. American Home Assur. Co.*, 584 F.2d 1306, 1315–16 (3d Cir.1978) (Federal Aviation Agency report concluding particular make of plane had safety problem and containing other expert opinion admissible on issue of whether air crash was suicide, absent evidence which impugned its trustworthiness). The contrast between the circumstances in the cases cited and the present ones is readily apparent. While Agent Egan submitted what may be considered an agency finding, the evidence was gathered and the affidavit executed solely to persuade a magistrate that there was "probable cause" to believe crimes were being committed at the location cited.

**29.** On October 6, 1986, the Virginia State Police and federal agents seized approximately 1.5 million documents from a building allegedly occupied by the debtors in Leesburg, Virginia. Of the evidence seized, the government in the instant case relied upon approximately 79 documents which the government refers to as "internal documents" of the debtors, and the summary of 3,000 promissory loan files, (Exh. 127).

*See* Exh. 41, pp. 67–68. The affidavit is not impartial, was prepared in anticipation of litigation, and cited statements made by confidential informants identified only as "John Doe # ". *See e.g.,* Exh. 41, p. 50 ("John Doe No. 19 further stated that the Fusion Energy Foundation, a tax exempt organization, was not used for tax exempt purposes but was rather principally used to support the lifestyle of Lyndon La-Rouche."). Courts admitted the agency findings cited in the cases above because they were able to rely on the agency's conclusions. Here, while we acknowledge the authenticity of the document, and consider the affidavit as evidence of the procedure by the which the debtors' internal documents were obtained, or as an example of information available to the United States Attorney's office at the time of the filings, we accord little weight to the affidavit as evidence of the truth of the matters asserted therein. *Cf. Ellis,* 745 F.2d at 303 (concern over methodology of studies relates to weight to accord evidence, not admissibility).

With respect to the documents proffered by the government pertaining to the alleged debtors' accounting procedures, we note that the information contained therein is not entirely supportive of the government's position. For example, the government cites Exhibit 63, a document entitled "1986 Budget Requests C & E," as proof that Fusion allots only 3% of its budget to "Travel and Seminars." In the same document, however, it is apparent that approximately half of Fusion's budget was allotted to "Editorial" expenses and "Basic Science Research." Exh. 63, p. 3. We also note that the government's Exhibit No. 108, entitled "Consolidated Profit & Loss for February 1984," shows a *net loss* for Fusion.

More importantly, however, we find that evidence indicating that an organization uses the word "profit" or even reflects a "profit" is not dispositive of the issue at hand. While nonprofit organizations are not expected to benefit from the sales or

services that they provide in the same way that commercial entities do, they must like any other organization monitor income and expenses. As noted in *In re United Kitchen Assoc., Inc.,* "[i]t is not a requirement that disbursements equal or exceed contributions in order to retain the status of a non-profit corporation[.]" 33 B.R. 214, 216 (Bankr.W.D.La.1983).

Finally, while attacking the credibility of the findings of the IRS in its post trial memorandum and the testimony of Mr. Dean, the government did not proffer evidence revealing that the tax exempt status of Fusion has been revoked, nor did the government challenge Mr. Dean's conviction that Fusion's activities were primarily educational in nature.

Turning now to the evidence submitted by Caucus Distributors Inc. in its behalf, we note that its charter of incorporation states the purposes of Caucus to be:

> To promote and encourage the political and (sic) ideas and beliefs fostered by the International Caucus of Labor Committees and other organizations advocating the same ideas and beliefs; to distribute to the general public, sell and obtain subscriptions to publications specifically dedicated to the political ideas and beliefs fostered by the International Caucus of Labor Committees and other organizations; to solicit membership for certain membership organizations associated with the publications distributed by the corporation consonant with the goals, purposes and programs of those organizations
>
> To advertise and promote the publications distributed by the corporation;
>
> To engage the services of writers, reporters, editors distributors, corporations, associations, partnerships and news agencies in furtherance of these purposes;
>
> To acquire, own, hold and dispose of all real and personal property necessary, convenient or incidental to accomplishing the purposes of this corporation[.]

Exh. AA, ¶ 3.[30] The charter also stated that Caucus was "not formed for pecuniary

---

**30.** We note that the Court's copy of Alleged Debtors' Exhibit AA was incomplete. In view of

the fact that the government withdrew its objection to the admission of Exhibit AA, (Tr. Vol.

profit or financial gain, and in that (sic) no part of the assets, income or profit of the corporation is distributable to, or inures to the benefit of its members, directors or officers, or any private person except to the extent permissible under the Not–For–Profit Corporation Law." Exh. AA, ¶ 2. Caucus further relies upon a document seized by the government which explicitly states that Caucus is a not-for-profit corporation, and refers to its production of several educational magazines. *See* Exh. 46.

In rebuttal, the government cites the affidavit of FBI Agent Lytle, which was prepared "in support of the government's Motion for Appointment of Interim Trustee[,]" and refers in part to alleged investments in real estate by Caucus (Exh. 39, p. 1). The government also relies upon documents similar to those used in the government's case against Fusion containing accounting data and discussions of that data. *See* Exhs. 45, 46, 48, 63, 65, 72, 79. The government also proffered Exhibit 111, an internal document labelled as "attorney-client work product," which the government maintains refutes the not-for-profit status of Caucus.[31]

We have the same reservations regarding an affidavit of an FBI agent, and documents which reflect only accounting information that we expressed above and need not repeat the relevant discussions here. Rather, we address the alleged admission by Caucus on this issue, which according to the government may be found in Exhibit 111. Exhibit 111 is a memorandum from "Rich Welsh" to "Mayer Morganroth, Esq." entitled "Accounting Issues (Report on Meeting, 7/17/85). On the last page of

the exhibit, the author remarks that accountants have indicated Caucus could not qualify as an "exempt (not-for-profit) corporation" because it "market[s] subscription sales for commercial companies." Exh. 111, p. 11. The author of the document also observed:

Remember, that although CDI filed as not-for-profit in its NY State incorporation papers, it has not formally applied for such status with IRS, which is where it counts.

*Id.*

At the top of every page of the document but the first page are the words, "PRIVILEGED ATTORNEY–CLIENT WORK PRODUCT PREPARED FOR USE OF COUNSEL." At trial, the alleged debtors objected to the admission of Exhibit No. 111 in part on the basis of its privileged nature. This Court admitted Exhibit 111 subject to the alleged debtors' ability to establish that the information contained in the document was protected by an attorney-client privilege. Tr. Vol. III, p. 59. The alleged debtors now have stated in a post trial submission "[d]ue to the invocation of their Fifth Amendment rights, there is no one who can testify as to the document's privileged status," and have requested that the document be stricken from the record. Alleged Debtors' Proposed Findings of Facts at 14, n. 1.

■ We note that the attorney-client privilege is applicable only to a client's communication made "for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding."[32] *United States*

III, pp. 146–47), this Court has taken judicial notice of the complete exhibit, filed as Exhibit No. 2 to the "Opposition of Alleged Debtors to Motion of the United States of America for Summary Judgment" on October 20, 1987.

**31.** In support of the proposition that the debtors are profit oriented entities, the government has proffered two exhibits that do not specifically refer to the debtors, Fusion or Caucus. *See* Exhs. 80, 109. The exhibits either refer to Campaigner alone, or *do not refer to a specific debtor.* We note that although the alleged debtors have agreed to a consolidation of their cases for the purposes of trial, the government needed to prove every element of the statute against

each of the debtors independently. Consequently, while this Court determined the documents to be admissible, we have determined the probative value of the above cited documents to be minimal.

**32.** Federal Rule of Evidence 501 provides that privileges generally are governed by the principles of the federal common law, however, "in civil actions ... [where] State law supplies the rule of decision, the privilege of a ... person, shall be determined in accordance with State law." Fed.R.Evid. 501. In *Commonwealth v. Edwards,* the Virginia Supreme Court stated that the burden of establishing that materials are privileged falls upon the proponent of the

*v. Jones,* 696 F.2d 1069, 1072 (4th Cir.1982). The alleged debtors themselves acknowledge that Exhibit 111 is a memorandum merely apprising an attorney of information gathered by accountants pertaining to Caucus' accounting procedures. *See* Alleged Debtors' Proposed Findings of Facts, p. 14 ("(Exhibit 111) merely suggests that at a point almost two years prior to the filing of the petition some discussion was held concerning Caucus' accounting methods."). Based upon the contents of the memorandum, we find that the author did not intend the recipient to proffer legal advice, and in fact with regard to the possible connection between Caucus' First Amendment rights and its tax exempt status the author stated: "We must become clearer on how this works, including such legal consultation *as is necessary.*" Exh. 111, p. 11 (emphasis supplied). Consequently, we decline to strike Exhibit No. 111, not on the basis of the alleged debtors' invocation of the Fifth Amendment, but upon this Court's review of the entire document and conclusion that the statements made therein are not privileged.

We note further, however, that the admission of Exhibit 111 is in actuality of little significance. In *In re United Kitchen Assoc., Inc.,* the petitioning creditor argued that "because the debtor corporation ha[d] not filed an exemption number for status as a non-profit corporation with the Internal Revenue Service then the court should recognize the debtor corporation as a nonprofit corporation." 33 B.R. at 216. The *United Kitchen* court responded by stating that "[t]his is a procedural matter for tax considerations to contributors, and does not change the status of the corporation under state law, nor does it change the

character or the nature of the activities of the corporation." *Id.* at 216–17.

Finally, proffered against both Fusion and Caucus, the government introduced numerous cease and desist orders, and an indictment issued against the debtors by state agencies that monitor the sale of securities. The government also proffered the summaries of the loans allegedly granted by creditors which the government demonstrated at trial could be cross referenced to the cease and desist order exhibits. *See* Exhs. 7, 15, 21, 125–127 (Fusion); 8–18, 21, 125–127 (Caucus).

We note at the outset that all of the cease and desist orders are temporary and provide that they will become permanent *if* no further hearing is requested. The government acknowledges that "certain of these cease and desist orders are technically denominated 'temporary',", but contends that the "continuing refusal of the debtors to respond to state information requests or request hearings has as a practical matter rendered them permanent." Government's Amended Statement of Facts ¶ 157. The government also explained that copies of the temporary orders were all that the government received when it requested copies of the agencies' files. Tr. Vol. II, p. 59.

While a court may take judicial notice of agency findings, this Court indicated during the course of the trial that it would not consider the agency findings to be conclusive of any issue. Tr. Vol. II, pp. 57–59. The government in response to this Court's remarks stated:

> Nor do we ask, just to be clear, that this be treated as a *res judicata* finding or anything. The cases that we cited in the

---

privilege. 235 Va. 499, 509, 370 S.E.2d 296, 301 (1988). To meet this burden of proof, a party seeking the protection afforded attorney-client communications must establish that the "attorney-client relationship existed, that the communications under consideration are · privileged, and that the privilege was not waived." 235 Va. at 509; 370 S.E.2d at 301 (citing *United States v. Jones,* 696 F.2d 1069, 1072 (4th Cir.1982)). In *United States v. Jones,* the Fourth Circuit specifically noted that the privilege applies only if: (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the

communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of stranger (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client. 696 F.2d at 1072.

memorandum merely say that those findings are extrinsic evidence to go to the point that we offered, and that's all we suggest it's for.

Tr. Vol. II, p. 59.

Again, the cases to which the government refers, which discuss agency findings after timely, impartial, factual inquiries are not similar the cease and desist orders at hand, which were issued on the basis of *ex parte*, administrative hearings most of which date back one to two years prior to the date of the filings. Moreover, even if this Court accepted the information contained in the orders and the loan summaries as true, the evidence only would establish that the debtors obtained promissory notes from individuals in various states, perhaps fraudulently or without the requisite licenses. That proposition alone is not probative of the ultimate concerns of *this* Court: whether the chief purpose of the alleged debtor is to engage in commercial enterprises; and, whether the money obtained by the alleged debtor was used to benefit the corporate officers personally or investors realized gain because of their ownership interest in the corporation. The government's evidence does not shed light on either aspect of this issue.

In one of the internal documents to which the government has directed our attention in connection with the issue of the debtors' eleemosynary status, we took note of the following excerpt:

> 1984 was the "Year of the Loan" in which a majority of income was comprised of loans. Infrastructure loan principal (including the first quarter of 1985) now stands somewhere around $10,000,000. About 90% of these notes come due in 1985. The attempt to change the composition of income is not only necessary from the standpoint of expanding our numbers and educating our base. It is also the case that we are losing a large number of supporters (and some quite bitterly) who made 1984 loans in the $1000–$5000 range.

Exh. 79, p. 1. This passage is representative of many within the internal documents seized by the government, which has led this Court to conclude that the debtors strived more to expose the world to its political viewpoint than attain private monetary gain. While the government has alleged that their methods of fund raising were reprehensible, that alone does not change the debtors' status and provide the appropriate basis for the invocation of *this* Court's jurisdiction. *See Sweatt v. Boston, H. & E.R. Co.*, 23 F.Cas. 530, 534 (C.C.D. Mass.1871) (No. 13,684) ("Religious, charitable, literary, and educational corporations are not subject to the bankrupt act, nor are corporations created for political purposes, even though they or some of them may transact large amounts of business, as their chief and ultimate purpose shows that they are not properly denominated moneyed, business, nor commercial corporations.").

In view of the foregoing, this Court finds that the government could not proceed against the alleged debtors, Fusion and Caucus, in an involuntary bankruptcy proceeding. In so holding, we seek not to protect the promotion of a particular ideology, but to preserve the intention of the Act and now the Code to limit the application of involuntary bankruptcy proceedings to only those entities truly commercial in nature.

BONA FIDE DISPUTE

In addition to questions relating to the eligibility of the alleged debtors, this Court also had concerns regarding the status of a claim by an intervening petitioning creditor, NCNB/National Bank of Florida. By trial's end, this Court had allowed several creditors to join in the involuntary petitions against the alleged debtors.[33]

---

**33.** At the close of trial, the following entities constituted the list of petitioning creditors:

> *Caucus:* (5) United States, MCI Communications, Inc., NCNB/National Bank of Florida, Continental Bank and the Commonwealth of Virginia (Department of Taxation);

> *Campaigner:* (4) United States, Peter Gonzalez d/b/a San Souci Travel, Inc., Marc Jung, and the Commonwealth of Virginia (Department of Taxation);

> *Fusion:* (4) United States, MCI Communications, Inc., NCNB/National Bank of Florida,

The act of intervention itself, however, does not guarantee that the creditor will be allowed to remain in the litigation. A creditor whose claim is subject to a bona fide dispute can not be counted as a petitioning creditor under section 303(b)(1) and would be dismissed. 11 U.S.C. § 303(b)(1).

NCNB/National Bank of Florida on behalf of Mr. Charles R. Zimmerman, filed a proof of claim against Fusion and Caucus in an amount in excess of 2.5 million dollars.[34] NCNB contends that between May 21, 1985 and February 17, 1986, Mr. Zimmerman made numerous loans to the debtors and upon discovering the extent of the loans and gifts, "took steps to protect his welfare." NCNB Post Trial Brief, p. 5. Accordingly, NCNB asserts that on February 24, 1986, Mr. Zimmerman wrote to the Executive Director of Fusion requesting that Fusion refrain from contacting him or NCNB regarding future gifts or loans and that the interest on the notes "be paid promptly when due." NCNB Exh. 50.[35] NCNB then obtained an "Order Appointing Guardian Upon Petition of Voluntary Guardian" from the Circuit Court of the Twelfth Judicial Circuit in Sarasota, Florida, dated February 28, 1986. NCNB Exh. 45. NCNB took possession and on June 25, 1986 filed an inventory of the property in its control which listed the promissory notes from Fusion and Caucus. NCNB Exh. 46.

The alleged debtors claim, however, that also on February 24, 1986, Mr. Zimmerman forgave all outstanding loans to both Caucus and Fusion. In support of their contention, the alleged debtors cite the deposition of Mr. Anthony Orr, former Head of Personal Trust Administration for NCNB in Orlando, Florida, the deposition of Mr. Zimmerman, and correspondence between Mr. Zimmerman and the debtors.[36]

In his deposition, Mr. Orr testified that a meeting took place on February 24, 1986 and the topic of forgiveness of debt arose between Mr. Zimmerman and representatives of Fusion. *See* Orr Deposition at 27, 29. Mr. Zimmerman's deposition testimony taken on July 7, 1987, indicates that he recalled a meeting in February 1986, and recalled forgiving notes rather than honoring checks to Fusion which had been returned for insufficient funds. Zimmerman Deposition at 111–13; Zimmerman Deposition Exh. T (letter from Fusion to Mr. Zimmerman regarding checks returned for insufficient funds).

The debtors contend, therefore, that although NCNB was appointed as the guardian of Mr. Zimmerman's property as the result of a voluntary guardianship proceeding, the loans in question were not property of the estate under Florida law. *See* Deposition of Mr. Orr at 53; *Bryan v. Century Nat'l Bank*, 498 So.2d 868, 872 (Fla.1986) ("The ward may, of course, deal with or dispose of any property left in his control without fear of later judicial invalidation."). Moreover, the debtors add that a genuine

---

and the Commonwealth of Virginia (Department of Taxation).

On the first day of trial, the government informed the Court that Wilmington Trust Co. had indicated its intent to intervene but would do so only in the event that this Court determined that the petition lacked a sufficient number of petitioning creditors. Tr.Vol. I, p. 5. In response to the government, this Court observed that Wilmington Trust Co. had "not taken [a] sufficient affirmative position in order to require a ruling." *Id.*, p. 9.

**34.** Of this amount, NCNB concedes that approximately half of the amount allegedly owed was given to the debtors as a gift and would not qualify as a claim under the Code. Tr.Vol. I, p. 46; NCNB Post Trial Memorandum, p. 4; *see* 11 U.S.C. § 303(b), *supra* text at 12–13 (petitioning creditor must be the "holder of a claim against such person").

**35.** Also in evidence is Exhibit U to the Deposition of Charles R. Zimmerman, a letter *also* dated February 24, 1986, addressed to NCNB/National Bank of Florida, requesting NCNB not to honor any checks written by Zimmerman payable to Fusion.

**36.** The deposition of Mr. Anthony Orr was held on April 18, 1988. Mr. Orr was employed by NCNB from December 8, 1980 through December 8, 1987. Orr Deposition at 3.

The deposition of Charles R. Zimmerman was held on July 7, 1987. The correspondence between Mr. Zimmerman and the alleged debtors is contained in Exhibits U (letter from Zimmerman to NCNB) and V (letter from Zimmerman to Fusion) to Mr. Zimmerman's deposition.

issue of fact remains as to whether Mr. Zimmerman was competent on February 28, 1986, the day he allegedly agreed to submit to a voluntary guardianship. The debtors maintain that such a guardianship requires an affirmative judicial determination of competency. *See* Fla.Stat. § 744.341(1) (1984) (stating in part: "The [voluntary] petition shall be accompanied by a certificate of a licensed physician that he has examined the petitioner and that the petitioner is competent to understand the nature of the guardianship and his delegation of authority.").

In response to the debtors' assertion that the loans have been forgiven, NCNB notes that the actual letter allegedly signed by Zimmerman forgiving all outstanding loans is dated March 2, 1986 and the deposition of Mr. Zimmerman upon which the debtors rely was taken on July 7, 1987, both of which were subsequent to the date on which the voluntary guardianship became effective, February 28, 1986.

Applying the guidelines in *In re Lough*, cited in this Court's opinion on the government's motion for summary judgment, a claim may be subject to a "bona fide dispute" within the meaning of section 303 of the Bankruptcy Code, when there is a "genuine issue of a material fact that bears upon the debtor's liability or a meritorious contention as to the applicability of the law to the facts." 57 B.R. 993, 997 (Bankr.E.D. Mich.1986); *see In re Busick*, 831 F.2d 745, 749–50 (7th Cir.1987) (applying *Lough* ); *In re Leach*, 92 B.R. 483, 487 (Bankr.D.Kan. 1988) (applying *Lough* ); *see Caucus*, 83 B.R. at 929. The role of the bankruptcy court is not to resolve the dispute, but merely to identify its presence for the purpose of including or eliminating the creditor from the count of petitioning creditors. *In re Lough*, 57 B.R. at 997; *see In re Leach*, 92 B.R. at 487 (statute does not require court to determine outcome of any dispute just its presence or absence).

Although NCNB states in its post trial memorandum that the discrepancies between the positions of the two parties may be resolved by this Court's determining a "very simple issue ... whether Zimmerman's signature on [the] March 2, 1986 [forgiveness letter], or his [deposition] testimony in July, 1987, was effective as a matter of law to 'forgive' th[e] loans as alleged by the debtors[,]" this Court need only ascertain the presence of a dispute. NCNB Post Trial Brief, p. 12. We also note, however, that the task of resolving the dispute would not be easy and perhaps not advisable given the existence of a state court action for rescission and money damages pending in the Circuit Court for the Twelfth Judicial Circuit for Sarasota County, Florida against the alleged debtors, involving the same subject matter.[37]

Accordingly, this Court, following the analysis set out in *In re Lough*, finds that the claim of Charles R. Zimmerman is subject to a bona fide dispute, which disqualifies NCNB as a petitioning creditor.[38]

GENERALLY NOT PAYING

Assuming that the instant petitions did not contain the aforementioned deficiencies, we find that the government has not established that the status of the debtors'

---

**37.** *See* Exh. A to NCNB's Proof of Claim (Complaint filed by NCNB/National Bank of Florida against Lyndon LaRouche, Fusion Energy Foundation, Inc., Caucus Distributors, Inc., Paul Gallagher, and Rochelle Ascher on September 17, 1986, Case No. 86–4414). The complaint filed by NCNB contained seven counts: Count I—Violations by Defendants of the Solicitation of Charitable Contributions Act; Count II—Violation by Defendants of the Florida Securities and Investor Protection Act; Count III—Undue Influence and Fraud in the Inducement; Count IV—Fraud, Misrepresentation and Deceit; Count V—Conversion; Count VI—Theft; Count VII—Violation of Racketeer Influenced and Corrupt Organizations Act.

**38.** If this Court had dismissed the United States as a petitioning creditor rather than dismiss all three petitions, the involuntary case against Fusion still would be subject to dismissal for the lack of a sufficient number of petitioning creditors in view of NCNB's disqualification. *See* 11 U.S.C. § 303(b) *supra* at 896 (requiring three creditors for involuntary petition against debtor who has more than twelve creditors); *see also supra* note 33 (identifying only two petitioning creditors for Fusion in addition to NCNB and United States); *see e.g., In re Amburgey*, 68 B.R. 768, 773 (Bankr.S.D.Ind.1987) (dismissing involuntary petition which lacked three holders of claims which were not disputed or contingent as to liability).

financial affairs warrants the administration of their estates in bankruptcy.

Section 303(h)(1) of the Bankruptcy Code prescribes that an order of relief may be entered on an involuntary basis if "(1) the debtor is generally not paying such debtor's debts as such debts become due[.]" 11 U.S.C. § 303(h)(1). The burden of establishing the above standard is upon the petitioning creditor(s). *In re Win–Sum Sports, Inc.*, 14 B.R. 389, 392 (Bankr.D. Conn.1981); *In re SBA Factors of Miami, Inc.*, 13 B.R. 99, 100 (Bankr.S.D.Fla.1981). In this Court's summary judgment opinion, we noted the varying considerations in determining whether a debtor is generally not paying its debts. *See Caucus*, 83 B.R. at 931–32 (citing *In re Dill*, 731 F.2d 629, 632 (9th Cir.1984) (generally not paying standard requires more general showing than merely establishing a few unpaid debts); *In re Dakota Lay'd Eggs*, 57 B.R. 648, 657 (Bankr.D.N.D.1986) (court must examine timeliness of payments, amount of debts overdue, length of time debtor unable to pay debts, reduction in debtor's assets and debtor's financial situation); *In re Leek Corp.*, 52 B.R. 311, 314 (Bankr.M.D.Fla. 1985) (court must compare number of debts unpaid each month to those paid, amount of delinquency, materiality of nonpayment, nature of debtor's conduct of financial affairs); *In re Win–Sum Sports, Inc.*, 14 B.R. 389, 392 (Bankr.D.Conn.1981) (number and amount of debts significant); *In re All Media*, 5 B.R. 126, 143 (Bankr.S.D.Tex. 1980) (generally not paying debts includes regularly missing a significant number of payments which are significant in amount

in relation to size of debtor's operations), *aff'd*, 646 F.2d 193 (5th Cir.1981)). All of the guidelines cited, while varying slightly in their emphasis, however, presume an analysis of the debtor's overall financial status *on the date the petition was filed. See In re Bishop, Baldwin, Rewald, Dillingham, & Wong, Inc.*, 779 F.2d 471, 475 (9th Cir.1985) ("generally not paying test is to be applied as of the date of filing of the involuntary petition"); *In re Laclede Cab Co.*, 76 B.R. 687, 691 (Bankr.E.D.Mo.1987) ("It is well settled that the operative date with respect to nonpayment of debt in an involuntary proceeding is the date of filing of the involuntary petition."); *In re Molen Drilling Co., Inc.*, 68 B.R. 840, 846 (Bankr. D.Mont.1987) (generally not paying test must be applied as of the date of filing); *In re Johnston Hawks*, 49 B.R. 823, 832 (Bankr.D.Haw.1985) (for the purpose of granting or denying relief debts must be examined at the time involuntary petition was filed); *In re Win–Sum Sports*, 14 B.R. 389, 392 (Bankr.D.Conn.1981) (alleged debtor's payment activity must be examined at the time of filing a petition).

In examining the evidence pertaining to the debtors' financial status, the admission of most of which was strenuously objected to by the alleged debtors,[39] this Court notes that the information contained in the documents evidences substantial nonpayment of the debtors' debts. Most of the documents proffered by the government, however, contain information pertaining to a period of time between six months to seven years *prior* to the date the petitions actually were filed.[40] The only exhibits upon

**39.** In a motion in limine and during the course of the trial, the debtors raised concerns regarding the chain of custody, origin, author and accuracy of the internal documents that the government alleged were seized from the debtors' premises, *see* Tr.Vol. I, pp. 91–99, and objected to the admission of the internal documents on the basis that the government failed to establish authenticity and that the documents contained hearsay, (Tr.Vol. I, pp. 258–262); *see supra* note 29 (discussion of "internal documents").

**40.** The government's evidence of the alleged debtors' inability to pay debts is summarized in their Amended Proposed Statement of Facts, paragraphs 15 through 192. *See* Amended Pro-

posed Statement of Facts, pp. 9–59, ¶¶ 15–192. Almost all of the exhibits identified by the government as pertaining to the debtors' financial condition, reveal financial problems outside the relevant time period. *See* Exh. 7 (California Desist and Refrain Order, December 19, 1985); Exh. 8 (Maryland Cease and Desist Order, March 11, 1986); Exh. 9 (Alaska Cease and Desist Order, April 10, 1986); Exh. 10 (Indiana Cease and Desist Order, May 2, 1986); Exh. 11 (Washington, Temporary Order to Cease and Desist, June 6, 1986); Exh. 12 (Minnesota Cease and Desist Order, July 17, 1986); Exh. 14 (Missouri Cease and Desist Order, August 23, 1986); Exh. 19 (Indictment/Federal Grand Jury: D.Mass. Criminal No. 86–323–K, December 16,

which the government relied which pertain to 1987 were five cease and desist orders, copies of petitions filed by intervening creditors, one internal document, and two newspaper articles.[41]

1986); Exh. 20 (Indictment/State Grand Jury: N.Y., no date); Exh. 21 (Indictments/State Grand Jury: VA, no date); Exh. 22 (*Ex Parte* Right to Attach Order: N.D.Cal., No. C–86–5820, October 10, 1986); Exh. 33 (United Press International Report, October 26, 1986); Exh. 38 (Declaration of George A. Rily, D.N.D.Calif. C–86–5820, Filed October 10, 1986); Exh. 41 (Affidavit of F.B.I. Special Agent Richard J. Egan); Exh. 45 (Copy of Internal LaRouche organization accounting and financial procedures memo entitled "The Profitability Analysis," no date); Exh. 48 (Copy of internal memo "Re: Collapse of Field Imprest funds/Accounting and Cash Flow Procedures," September 25, 1986); Exh. 49 (internal memo "Re: Critical Financial Situations," May 30, 1986); Exh. 50 (internal memo regarding unpaid loans, attempts to obtain forgiveness of debt, renegotiations of interest rates, April 30, 1986); Exh. 51 (internal memo regarding unpaid loans and attempts to obtain forgiveness of debt, May 5, 1986); Exh. 52 (internal memo regarding unpaid bank loans, May 6, 1986); Exh. 53 (internal memo regarding unpaid loans, May 9, 1986); Exh. 54 (internal memo regarding unpaid loans, threatened lawsuit, and correspondence from Victoria Bank, May 14, 1986); Exh. 55 (internal memo regarding unpaid loans and lawsuits, May 29, 1986); Exh. 56 (internal memo re payroll withholding tax arrears of Campaigner Publications, Inc., Fusion Energy Foundation, Inc., and Caucus Distributors, Inc., August 4, 1986); Exh. 57 (internal memo regarding unpaid withholding and FICA taxes for 1984, 1985, and 1986 for Caucus Distributors, Inc., Fusion Energy Foundation, Inc. and Campaigner Publications, Inc., March 12, 1986); Exh. 58 (Form letter from Caucus Distributors, Inc. to its unpaid creditors seeking forgiveness or renegotiation of its debt, May 20, 1986); Exh. 63 (1986 Third Quarter Budget Requests C & E, July 10, 1986); Exh. 66 (Chargeback and Complaint Report for week of January 10, 1986, January 14, 1986); Exh. 67 (Complaint letters from promissory note holders regarding Caucus Distributors, Inc., dating from 2/14/85—9/5/86); Exh. 68 (Complaint letters from promissory note holders regarding Campaigner Publications, Inc., dating from 8/12/85—8/11/86); Exh. 69 (Complaint letters from promissory note holders regarding Fusion Energy Foundation, Inc., dating from 1/22/86—7/25/86); Exh. 70 (Letter with notation at top concerning settlement of claim, April 2, 1986); Exh. 73 (internal memo re Trade Creditor Litigation, February 22, 1986); Exh. 74 ("Dead Debt" report, March 11, 1986); Exh. 75 (Form letter from Caucus Distributors, Inc. regarding trading services in lieu of paying debt, March 12, 1986); Exh. 76 (Charts of Accounts printout, no date); Exh. 78 (internal memo entitled "Tax Filing Status" for years 1976–1984, November 20, 1984); Exh. 79 ("Non Campaign Loans" memo with attachment, March 30, 1985); Exh. 81 (Infrastructure Loan Renegotiation summary, August 23, no year); Exh. 83 (Notice of IRS Levy to Fusion Energy Foundation, Inc., July 10, 1986); Exh. 86 ("Necessary Amex Refunds" memo, September 25, 1986); Exh. 87 ("Old Debt Oddities" memo, May 2, 1986); Exh. 88 (Form letter from Campaigner Publications, Inc. to its unpaid creditors seeking forgiveness or renegotiation of its debt, May 20, 1986); Exh. 89 (Infrastructure Loans memo, April 20, 1986); Exh. 90 (List of hardship cases memo, April 12, 1986); Exh. 91 ("Loan Infrastructure situation on West Coast" memo, no date); Exh. 92 ("Loan Repay 'Special' Candidates," no date); Exh. 93 (March 1986 Loan Budget memo); Exh. 94 ("Finance Warfare/Loans" memo, no date); Exh. 95 (List of Loan repayment "must" cases, April 22, 1986); Exh. 96 (List of possible loan repayment cases, June 10, 1986); Exh. 97 (Loan Repay Committee memo, October 18, 1985); Exh. 98 (1985 Infrastructure loan memo); Exh. 99 (Fourth Quarter 1985 Summary Budget Proposal); Exh. 100 (Loan forgiveness campaign memo, no date); Exh. 101 (Interest rate reduction memo, September 15, 1986); Exh. 103 (Renegotiate Interest rate memo, June 25, 1986); Exh. 104 (Cease and Desist Orders memo, September 16, 1986); Exh. 105 ("Required Payments" memo, August 9, 1986); Exh. 106 (Loan Renegotiation Report, September 20, 1986); Exh. 107 (Second Quarter 1986 budget memo, May 24, 1986); Exh. 111 (Accounting issues meeting report, July 17, 1985); Exh. 112 (Fusion tax memo, December 14, 1985); Exh. 113 (memo entitled, "CDI's Relationship with MCI," September 17, 1986); Exh. 114 (memo entitled "Explanation of Loan Transaction Report" and code list, October 1, 1986); Exh. 118 (LaRouche memo entitled "Cost Accounting Based Upon Flexible Forecast Budgets Consistent with Physical Economy," March 29, 1986); Exh. 119 (memo to LaRouche re legal cases and promissory notes/hardship cases with attachments, May 19, 1986); Exh. 120 (Report Regarding "Payments Needed/Infrastructure Debt," September 24, 1986); Exh. 122 (Legal Department 2nd Quarter Case Area Overview, March 3, 1986); Exh. 126 (Transaction Detail Report, dated September 30, 1986; report alleged to be a summary of debtors' promissory note files, *see* Tr.Vol. III, p. 8; information contained in report dated from early 1980 through September 1986); Exh. 127 (Virginia State Police Summary of 3,000 promissory files; although dated April 30, 1987, the information regarding promissory note holders was summarized from documents seized on October 6, 1986).

**41.** The only exhibits which reflected dates in 1987 were five cease and desist orders (Exh. 13 (Massachusetts Cease and Desist, April 15,

As explained above, this Court declines to consider the information contained in the cease and desist orders as evidence of the truth of the matters asserted therein. The admission of the internal document (Exh. 44) was denied at trial on the basis that the government failed to establish its authenticity, *see* Tr. Vol. II, p. 87, and newspaper articles were admitted by this Court for the limited purpose of establishing what the government knew of or had read about the debtors' creditors at the time the petitions were filed, not for the truth of the assertions made therein, *see* Tr. Vol. II, pp. 79–80.

The government's Exhibit No. 48 illustrates well the problems inherent in evaluating financial data pertaining to a time much earlier than the petition date. As listed by the government, Exhibit 48 was a "Copy of an Internal Memo Re: Collapse of Field Imprest Funds/Accounting and Cash Flow Procedures," dated September 25, 1986. The debtors concede that Exhibit 48 contained the following information concerning Caucus' financial status:

(1) Caucus' field office operation (which appears to be 12 offices) had monthly expenses of approximately $80,000 to $90,000 per month; those expenses were presumably being paid out of operating revenues until September 1985 when the imprest fund was created; (2) By April 1986 the central imprest fund could only fund approximately 80–95% of the budget, with the field office making up the deficit from locally created revenues; (3) By May 1986 the centralized payments declined to 50% and by September 1986 the central office stopped payments with the local field offices paying expenses directly from locally generated revenues.

Alleged Debtors' Proposed Conclusions of Law, p. 31, ¶ 77. The government offered

no evidence establishing whether the September 1986 condition continued or was corrected.

*Assuming* that the admission of all of the documents proffered by the government was proper, the issue of how much weight should be afforded the exhibits in evaluating the debtors' financial positions is problematic. The alleged debtors claim that the lack of evidence regarding their financial condition on the date the petition was filed is fatal to the government's case. The government has responded by noting that:

[t]he evidence is unequivocal that each of the debtors had massive unpaid amounts of debt as of October, 1986.... Moreover, the only reason why the Court does not have direct testimony from the debtors on the circumstances between October, 1986 and the petition date is because the debtors invoked a blanket Fifth Amendment.... The clear weight of the evidence, the increasingly difficult cash situation the debtors found themselves in throughout 1986, the willingness of other creditors to join in these petitions, and the failure of the debtors to present any evidence to the contrary as to their payment of any debt whatsoever, certainly establish that as of the petition date, the debtors were generally not paying their debts as they become due.

Post Trial Memorandum of United States, pp. 28–29.

Certainly, courts must evaluate financial information pertaining to a period of time prior to the actual date of the petition to make its assessment of whether debts generally are being paid. *See e.g., In re Molen Drilling,* 68 B.R. at 846 (examining evidence of the debtor's financial condition for the summer months prior to a petition filed in September of the same year). We find,

1987); Exh. 15 (Virginia State Corporation Commission Opinion and Order, March 4, 1987); Exh. 16 (Montana Cease and Desist Order, April 1, 1987); Exh. 17 (New Mexico Securities Division Order, August 6, 1987); Exh. 18 (Connecticut Cease and Desist Order; January 12, 1987)), copies of creditors' petitions (Exh. 23 (Copy of Creditor's Petition, Continental Bank, September 21, 1987); Exh. 24 (Copy of Creditor's Petition, MCI Communications, June 25, 1987);

Exh. 25 (Copy of Creditor's Petition filed by Sans Souci, July 10, 1987); Exh. 26 (Copy of Creditor's Petition, NCNB/National Bank of Florida, July 1, 1987)), one internal document (Exh. 44 ("Morning Briefing for Thursday, March 5, 1987)), and newspaper articles (Exh. 34 (United Press International Report, March 18, 1987); Exh. 35 (Associated Press Report, March 5, 1987); Exh. 37 (Copy of Associated Press Article, March 29, 1987)).

however, that such a time period should not exceed the bounds of reasonableness. To determine what period of time is reasonable, we look generally to the purpose behind ascertaining the debtor's financial condition in a trial upon an involuntary petition, which is to determine whether the creditors are entitled to the relief requested.

In the instant case, the government in filing the involuntary petitions under Chapter 7 seeks the liquidation of all of the debtors' assets. This Court has no basis to grant the drastic relief requested if the *most recent information* before the Court regarding the debtors' payment practices is dated approximately six months prior to the date the petition was filed. Absent crucial proof relating to the debtors' financial status as of the date the petitions were filed, other factors cited by the government such as the alleged transfers of assets, the alleged schemes of intentional nonpayment, and the joining of other creditors have little relevance. We note that courts have considered other factors, or "special circumstances" unique to the debtor only in cases in which the petitioning creditor has established the minimal basis for relief, and it appears that the petitioning creditor is the *sole* creditor of the debtor. The concern of the courts in those cases is whether the failure to pay a single creditor is sufficient to warrant a finding that the debtor is *generally* not paying its debts. *See e.g., In re 7 H Land & Cattle Co.,* 6 B.R. 29, 30, 32 (Bankr.D.Nev.1980) (allegation in involuntary petition that debtor had less than twelve creditors not controverted, therefore, issue was whether failure to pay single creditor was sufficient under § 303; court determined that special circumstances such as fraud, trick, and artifice may be considered); *see also In re Nordbrock,* 772 F.2d 397, 400 (8th Cir.1985) (in absence of fraud or some special need for bankruptcy relief, failure to pay single debt does not establish that debtor is generally not pay-

ing his debts); *In re Central Hobron Assoc.,* 41 B.R. 444, 448, 451 (D.Haw.1984) (generally one creditor with one debt cannot put debtor into involuntary bankruptcy absent special circumstances such as debtor's trick, fraud, artifice or sham). It appears that no court, however, has determined that the granting of an involuntary petition on the basis of unusual factors alone is proper.

Perhaps the only plausible basis for speculating about the debtors' financial condition on April 20, 1987 is the government's request that this Court draw negative inferences on the basis of the debtors' invocation of the Fifth Amendment.

## NEGATIVE INFERENCES

As noted earlier, the alleged debtors by counsel, and by representatives of the debtor corporations, declined to respond to discovery requests and questions posed during depositions, and also declined to testify at trial on the basis of the Fifth Amendment.[42] Accordingly, the government repeatedly has urged this Court to draw adverse inferences from the debtors' silence.

While declining to draw adverse inferences to bolster the government's motion for summary judgment, *Caucus,* 83 B.R. at 925–26, this Court recognizes that the Fifth Amendment does not forbid the drawing of "adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them[.]" *Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976); *see United States v. Ianniello,* 824 F.2d 203, 208 (2d Cir.1987); *RAD Services, Inc. v. Aetna Casualty and Surety Co.,* 808 F.2d 271, 274 (3d Cir.1986); *United States v. Local 560 of Internat'l Brotherhood of Teamsters, Etc.,* 780 F.2d 267, 292–93 n. 32 (3d Cir.1985), *cert. denied,* 476 U.S. 1140, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986); *National Acceptance Co. of America v. Bathalter,* 705 F.2d 924, 929 (7th Cir.1983); *see generally J. Wig-*

---

**42.** *See supra* note 6 (quoting Fifth amendment); *Caucus,* 83 B.R. at 924. Since the trial on these involuntary petitions, the United States Supreme Court has determined that a "corporate custodian ... may not resist a subpoena for

corporate records on Fifth Amendment grounds." *Braswell v. United States,* 487 U.S. 99, ——, 108 S.Ct. 2284, 2290, 101 L.Ed.2d 98 (1988).

*more on Evidence,* ¶ 2272 at 439–72 (McNaughton rev. 1961). Prior to a court's drawing of an adverse inference, however, there must be sufficient independent evidence of the assertion in addition to the mere invocation of the privilege. *See Baxter,* 425 U.S. at 318, 96 S.Ct. at 1558 (requiring "probative" evidence); *United States v. Local 560,* 780 F.2d at 293 n. 32 (requiring "independent" evidence); *Bathalter,* 705 F.2d at 930, 932 (interpreting *Baxter* as requiring "adverse" evidence); *In re Einhorn,* 29 B.R. 966, 970 (Bankr.E.D.N.Y.1983) (requiring "substantial" evidence). Bankruptcy courts previously have drawn adverse inferences where the circumstances have so warranted. *See In re McGohan,* 75 B.R. 10, 13 (Bankr.N.D.N.Y. 1986) (where debtor failed to appear at trial on basis of Fifth Amendment, court inferred that testimony of debtor would have been unfavorable in view of evidence presented which clearly established debtor's actual intent to embezzle funds placed in debtor's control); *Chase Manhattan Bank, N.A. v. Frenville,* 67 B.R. 858, 862 (Bankr.D.N.J.1986) (court drew adverse inference against debtor who asserted Fifth Amendment privilege where evidence set forth in moving papers constituted *prima facie* case); *In re Fields,* 44 B.R. 322, 328 (Bankr.S.D.Fla.1984) (court drew logical inference that debtor intended to deceive creditor where debtor failed to testify and evidence established intent of debtor to make false representations). If such independent evidence exists, the drawing of an adverse inference against a silent party in a civil action is not an invalid practice. *Baxter,* 425 U.S. at 320, 96 S.Ct. at 1559.

█ In the instant case, the independent evidence supplied by the government suggests that the debtors had major financial difficulties from early 1984 through September 1986. Even if this Court drew the logical inference based upon the government's evidence, that the debtors indeed did have financial difficulties during the above cited time period, this Court's conclusion would not relate to the appropriate period of time, the date of the government's filing, to support the contention that the debtors were generally not paying their debts when due. What the alleged debtors seem to suggest here, however, is that if the evidence reveals financial difficulty from 1984–1986, then this Court has the basis to "infer" that that evidence reflects the debtors' financial status as of the date of the filings. While this Court is aware that the drawing of negative inferences is appropriate under certain circumstances, it is unwilling and without authority to infer beyond what the independent evidence establishes. *See In re Mart,* 90 B.R. 547, 552 (Bankr.S.D.Fla.1988) (totality of evidence did not support drawing of adverse inference against debtor who asserted Fifth Amendment privilege); *In re Stelweck,* 86 B.R. 833, 849 (Bankr.E.D.Pa.1988) (absent convincing independent evidence of fraud, court will not infer fraud on the basis of debtor's invocation of Fifth Amendment privilege); *accord In re Einhorn,* 29 B.R. at 970 (declining to grant summary judgment based solely upon debtor's invocation of Fifth Amendment).

In view of the government's inability to proffer direct and timely evidence pertaining to the debtors' financial status, or "independent" evidence enabling this Court to draw "inferences" against the debtors in view of their invocation of the Fifth Amendment, we find that the government has failed to establish that the debtors generally were not paying their debts as they became due as of April 20, 1987, the date the petitions were filed.

## BAD FAITH

We now come to perhaps the most important issue before this Court, and that is whether the government filed the instant involuntary petitions in bad faith. The debtors have alleged that the bad faith of the government is evident in three ways. First, they maintain that the filing of involuntary petitions as a single creditor with the knowledge that each debtor had in excess of twelve creditors, in and of itself constitutes bad faith. Second, the debtors claim that the petitions were filed for an ulterior motive. Third, the debtors assert that the government's bad faith further is established by its failure to utilize traditional methods to collect its judgments.

In response, the government contends that the filing of the involuntary petitions as a single creditor in bankruptcy court is supported by applicable bankruptcy law. More specifically, the government asserts that the authority to file as a sole petitioning creditor may be found in the Fourth Circuit's decision in *Sun–Lite Awning Corp. v. E.J. Conklin Aviation Corp.*, 176 F.2d 344 (4th Cir.1949). The government. also claims that the petitions were not filed to accomplish an ulterior purpose, but in fact were filed for policy reasons that are in complete accord with the goals of federal bankruptcy law.

■ We note that the allegations by the alleged debtors pertaining to the government's bad faith constitute an affirmative defense to the maintenance of these involuntary petitions. *See Caucus*, 83 B.R. at 932 n. 12. As such, the good faith of the government is presumed, *see In re CLE Corp.*, 59 B.R. 579, 583 (Bankr.N.D.Ga. 1986), and the debtors must prove bad faith by a preponderance of the evidence, *see In re Alta Title*, 55 B.R. 133, 141 (Bankr.D. Utah 1985). The issue of bad faith is factual, *see United States Fidelity & Guar. Co.*

*v. DJF Realty & Suppliers*, 58 B.R. 1008, 1011 (N.D.N.Y.1986) (bad faith in an involuntary proceeding is a factual issue); *In re Advance Press & Litho, Inc.*, 46 B.R. 700, 704 (D.Colo.1984) (whether party acted in bad faith is a question of fact to be determined by the court); *In re Wavelength*, 61 B.R. 614, 620 (Bankr. 9th Cir.1986) (whether party acted in bad faith is a question fact), and a conclusion by the reviewing bankruptcy court must then be based upon the "totality of the circumstances." *In re Elsub Corp.*, 66 B.R. 189, 192 (Bankr.D.N. J.1986).

■ While the concept of "good faith" is applicable to various aspects of bankruptcy law, the Code does not contain a definition of "good faith." *See In re Laclede Cab Co.*, 76 B.R. 687, 693 (Bankr.E.D.Mo.1987) ("bad faith" is not specifically defined in Bankruptcy Code). Consequently, the factors which a court must take into consideration vary depending upon the matter at hand. *See generally* R. Ordin, "The Good Faith Principle in the Bankruptcy Code: A Case Study," 38 Bus.L. 1795 (August 1983). Courts, therefore, have devised various guidelines uniquely applicable to involuntary petitions.[43] It is clear now,

---

**43.** Courts have considered a variety of factors in their efforts to determine whether a petitioning creditor has acted in bad faith, such as whether the petitioning creditor evidenced an intent to vex or oppress, *see e.g., In re Howard, Neilsen & Rush, Inc.*, 2 B.R. 451, 453 (Bankr.M.D.Tenn. 1979), was ill advised, motivated by spite, malice or a desire to embarrass the debtor, *see e.g., Camelot v. Hayden*, 30 B.R. 409, 411 (E.D.Tenn. 1983), or was not a creditor of the debtor, at the time the petition was filed, *see e.g., In re Hunt*, 496 F.2d 882, 885 (5th Cir.1974); *In re Philadelphia Rapid Transit Co.*, 8 F.Supp. 51, 55 (E.D. Pa.), *aff'd*, 73 F.2d 1022 (3d Cir.1934); *In re Hudson Coal*, 22 F.Supp. 768, 770 (M.D.Pa. 1938). Courts also have considered whether the petition was filed to invoke a customary collection proceeding, *see e.g., In re Tarisi & Tighe*, 88 B.R. 706 (Bankr.W.D.Pa.1988); *In re Allen Rogers & Co.*, 34 B.R. 631, 633 (Bankr.S.D.N.Y. 1983); *In re SBA Factors of Miami, Inc.*, 13 B.R. 99, 100 (Bankr.S.D.Fla.1981), was filed without "due investigation," *see e.g., In re Alta Title Co.*, 55 B.R. 133, 141 (Bankr.D.Utah 1985); *In re Godroy Wholesale Co., Inc.*, 37 B.R. 496, 500 (Bankr.D.Mass.1984), or was frivolous and without legal justification, *see e.g. In re Ramsden*, 17 B.R. 59, 60 (Bankr.N.D.Ga.1981). Courts also have found bad faith where the jurisdiction of

the court "has been improperly invoked." *In re Saint Matthew Lutheran Church of Irvine, Calif.*, 6 Bankr.Ct.Dec. (CRR) 578, 579 (Bankr.C.D.Calif.1980); *see In re Crown Sportswear, Inc.*, 575 F.2d 991, 993 (1st Cir.1978) ("Intervention is a matter of right unless the bankruptcy court finds the petition was made in bad faith for the purpose of improperly invoking its jurisdiction."); *In re Winn*, 49 B.R. 237, 239 (Bankr.M. D.Fla.1985) (court must protect the integrity of its jurisdiction); *accord In re Nancant, Inc.*, 8 B.R. 1005, 1009 (Bankr.D.Mass.1981) (sole purpose of invoking jurisdiction of court was to determine real estate tax liability); *In re Northwest Recreational Activities, Inc.*, 4 B.R. 36, 39 (Bankr.N.D.Ga.1980) (good faith is merged with power of court to protect jurisdictional integrity), or where the petition filed did not promote an interest contemplated by the Code, *see In re Laclede Cab Co.*, 76 B.R. 687, 693 (Bankr.E.D. Mo.1987). The level of proof required in order to sustain a finding of bad faith also has varied. *Compare In re McDonald Trucking Co. Inc.*, 74 B.R. 474, 479 (Bankr.W.D.Pa.1987) (lack of statement in petition regarding number of creditors is attempt to circumvent Bankruptcy Code and is itself a measure of creditor's intent and is sufficient to reach a finding of bad faith) *with In re Molen Drilling Co., Inc.*, 68 B.R. 840, 844–45 (Bankr.D.Mont.1987) (in considering peti-

however, where the assertion has been made that an involuntary petition was filed in bad faith, a majority of courts evaluate whether a reasonable person would have filed the petition (objective test), as well as the motivations of the petitioning creditor (subjective test), some with reference to Federal Rule of Civil Procedure 11 ("Rule 11").[44] Fed.R.Civ.P. 11. Bankruptcy Rule 9011, the corresponding rule to Rule 11, provides in part:

> The signature of an attorney or a party constitutes a certificate that the attorney or party has read the document; that to the best of the attorney's or party's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; and that it is not interposed for any improper purpose, such as to harass, to cause delay or to increase the cost of litigation.

Bankr.R.P. 9011(a).

We examine first whether a "reasonable person in the position of the petitioning creditor would have initiated the bankruptcy proceeding." *In re Elsub Corp.*, 66 B.R. 189, 196 (Bankr.D.N.J.1986). A court's evaluation of this issue, must include a review of the petitioner's pre-filing inquiries into the total number of claim holders, *see id.*, as well as a review of the legal justification for the filing, *see In re Turner*, 80 B.R. 618, 624 (Bankr.D.Mass. 1987). With respect to the former, this Court need not dwell upon what inquiries the government made and whether the government should have known that the alleged debtors had in excess of twelve creditors, in view of its admission on this issue. It is clear that the government knew of the number of the debtors' creditors, and chose to file as a single creditor.

Again, the most recent and authoritative decision on the good faith of petitioning creditors is the Eighth Circuit's decision in *Basin Electric Power Cooperative v. Midwest Processing Co.*, 769 F.2d 483, 486 (8th Cir.1985), *cert. denied*, 474 U.S. 1083, 106 S.Ct. 854, 88 L.Ed.2d 894 (1986). As noted above, the petitioning creditor in *Basin*

---

tioning creditor's motivations, courts have required nearly unconscionable behavior before finding bad faith).

**44.** The earlier decisions addressing the issue of bad faith stated that the motivations of creditors were irrelevant. *See e.g., In re Automatic Typewriter & Serv. Co.*, 271 F. 1, 4 (2d Cir.1921) (reasons or motives which inspired or instigated involuntary proceedings are of no importance, and will not defeat an adjudication); *In re Nat'l Motorship, Corp.*, 7 F.Supp. 1001, 1001 (S.D.N.Y. 1934) (if bankruptcy petition is sufficient on its face, then adjudication should follow regardless of motivation of original petitioners). Consequently, while some courts examined the creditor's subjective intent, *see e.g., In re SBA*, 13 B.R. 99, 100 (Bankr.S.D.Fla.1981) (court determined that petitioners were using involuntary proceeding as substitute for customary collection procedures); *In re Nancant*, 8 B.R. 1005, 1009 (Bankr. D.Mass.1981) (sole purpose for invoking jurisdiction of federal bankruptcy court was to determine local real estate liability); *accord In re Win–Sum Sports, Inc.*, 14 B.R. 389, 394 (Bankr. D.Conn.1981) (dismissing petition under 11 U.S.C. § 305(a)(1) upon determining that creditor was using bankruptcy court as an alternative approach to state court procedures to resolve intra-company management and stockholder problems), courts more often have evaluated the bad faith of a petitioning creditor in terms of whether a reasonable person under the same circumstances would have filed. *See e.g., In re Wavelength*, 61 B.R. 614, 620 (Bankr. 9th Cir. 1986) (bad faith should be measured by an objective test); *In re McDonald Trucking Co., Inc.*, 74 B.R. 474, 478 (Bankr.W.D.Pa.1987) (bad faith is measured by obejctive standard); *In re Vincent J. Fasano, Inc.*, 55 B.R. 409, 418 (Bankr. N.D.N.Y.1985) (evidence submitted on issue of bad faith should be measured through an objective rather than subjective standard); *In re Grecian Heights Owners' Assoc.*, 27 B.R. 172, 173 (Bankr.D.Or.1982) (courts must evaluate the objective reasons for filing). Most recently, courts have examined both the objective *and* subjective bases for filing the involuntary petition, with and without reference to Rule 11. *See In re Turner*, 80 B.R. 618, 626–27 (Bankr.D.Mass. 1987) (bad faith should be measured by subjective and objective standards); *In re Petralex Stainless, Ltd.*, 78 B.R. 738, 743 (Bankr.E.D.Pa. 1987) (attorney must certify validity of filing on objective and subjective levels); *United States Fidelity & Guar. v. DJF Realty & Suppliers, Inc.*, 58 B.R. 1008, 1011 (N.D.N.Y.1986) (better practice is to inquire into both creditor's conduct and motives for filing); *accord In re Better Care Ltd.*, 97 B.R. 405, 410 (Bankr.N.D.Ill.1989) (examining whether petition was filed for an "improper purpose," *and* whether the petition constituted an "improper use" of the bankruptcy court's jurisdiction).

filed as a single creditor although it knew that the debtor had in excess of twelve creditors, and on appeal challenged the lower court's finding of bad faith. 769 F.2d at 485. Upon a review of the authority on the issue of a bad faith dismissal, the Eighth Circuit observed:

> The district court concluded correctly that it is not the making of a false statement alone that constitutes bad faith, but the wrongful attempt to commence a bankruptcy proceeding. As the bankruptcy court noted in *In re Rite Cap, Inc.*, 1 B.R. 740, 741 (Bankr.D.R.I.1979), 'An essential prerequisite for allowing joinder of additional creditors to cure a defective petition is that the petition was filed in good faith. If the original petition was a sham, prepared with a view of being later supported by intervention of other creditors, joinder should be denied.'

*Id.* at 486. This Court finds the ruling of the Eighth Circuit to be controlling because of the need to uphold the integrity of the provisions of the Bankruptcy Code. *See In re Herriott*, 1 Bankr.Ct.Dec. (CRR) 793, 794 (Bankr.D.Mass.1975) ("If there were no restraint a creditor might with impunity ignore the statutory scheme and avoid the difficulty and frustration in seeking two creditors willing to join with him in filing an involuntary petition."); *accord In re Winn*, 49 B.R. 237, 239 (Bankr.M.D.Fla. 1985) ("[R]egardless of the nature of the petition, whether voluntary or involuntary, the Court must protect the integrity of its jurisdiction[.]"). We also note that courts consistently have stated that a "lack of a due investigation" into the number of a debtor's creditors will result in a finding of bad faith. *See In re Alta Title Co.*, 55 B.R. 133, 141 (Bankr.D.Utah 1985) (absence of pre-filing inquiry generally will support bad faith finding); *In re Godroy Wholesale Co.*, 37 B.R. 496, 500 (Bankr.D.Mass. 1984) (where petitioning creditor failed to make additional inquiries which would not have been time consuming nor disproportionate to the relief it requested, the creditor acted in bad faith). It would be inconsistent, therefore, to reward the creditor who *knows* he is filing improperly as a single petitioning creditor, by enabling him to escape a bad faith finding.

The government's reliance upon the Fourth Circuit's ruling in *Sun–Lite Awning Corp. v. E.J. Conklin Aviation Corp.*, is misplaced. 176 F.2d 344 (4th Cir.1949). In *Sun–Lite*, the district court dismissed a bankruptcy petition filed by a sole petitioning creditor against a debtor who had more than twelve creditors. *Id.* at 346. The Fourth Circuit held that prior to the dismissal of a case in which it has been determined that an insufficient number of petitioning creditors have filed, a court must grant the petitioning creditor time to notify other creditors who may wish to join the petition. *Id.* The *Sun–Lite* court expressly noted, however, that

> [w]hether a court could dismiss a petition after the intervention of other creditors on the ground that the allegation that the number of creditors was less than twelve was fraudulent, we need not here decide, as the judge did not here find fraud or even bad faith in the filing of the petition.

*Id.* at 347. Clearly, there was no indication in *Sunlite* that the petitioning creditor "knew" or "should have known" that the debtor had in excess of twelve creditors. Consequently, the government did not have a reasonable basis for relying upon *Sunlite Awning* as authority to file as a single petitioning creditor in the instant cases.

The government also contended that it felt an obligation to keep the involuntary filings secret, until interim trustees were appointed, to prevent the debtors from transferring assets. *See* Tr. Vol. III, p. 86. This argument seems to suggest, however, that the government may file an involuntary petition as a sole creditor in instances where three petitioning creditors are required to avoid publicity of its actions. While the government believed its needs as a creditor to be unique, the treatment of the government cannot be. *Cf. In re Bellucci*, 24 B.R. 493, 497 (Bankr.D.Mass.1982) ("[I]t is not within the province of the court to fashion the Bankruptcy Code to meet the facts and needs of the particular case before it."), *aff'd*, 29 B.R. 814, 815 (Bankr. 1st Cir.1983). The same provisions of the Code

which enable the government, like any other creditor, to file an involuntary petition in bankruptcy, also impose upon the government the responsibilities common to all petitioning creditors. *Cf. Cone Mills Corp. v. NLRB*, 413 F.2d 445, 454 (4th Cir.1969) ("Few rights, ... exist without corresponding duties and obligations to those against whom the right is being asserted.); *In re Whitten*, 11 B.R. 333, 340 n. 13 (Bankr.D. D.C.1981) ("For every right, there is a correlative duty ...").

With respect to the pre-filing inquiries into the substantive aspects of the instant petitions, we note summarily that the government's decision to file in the instant case reflected less the good faith extension of the law, than a questionable reliance upon existing law. While one court has indicated that the lack of time may justify a less than complete examination of the law on involuntary bankruptcy petitions, the government did not face an inflexible deadline in the instant cases. *See In re Turner*, 80 B.R. 618, 620, 626–27 (Bankr.D. Mass.1987) (existence of the first of two *ex parte* court orders approving attachments on debtor's homes required counsel to make a quick decision to prevent attachment from becoming immune from attack as a preference).

Accordingly, an evaluation of the government's filing on an objective level leads this Court to conclude that the alleged debtors have established that the government filed the petition in bad faith. It is not the filing of an involuntary petition by the United States that constitutes bad faith, as suggested by the debtors, in that we are aware of at least one instance where the government filed an involuntary petition without notoriety in *Missco Homestead Ass'n v. United States*, 185 F.2d 280 (8th Cir.1950), but the failure to comply with the applicable provisions of the Code that compels this conclusion with regard to the objective prong of the bad faith test.

It is quite apparent that a determination of the subjective motivations of a petitioning creditor is a most difficult task. While in some instances courts may have the benefit of direct evidence or testimony regarding the creditor's decision making process, it is the more usual situation that courts must surmise the petitioning creditor's intent based upon the circumstances of the case. In this regard, one avenue of the courts has been to grant liberal discovery requests to enable a debtor to determine better what the petitioning creditor's motivations were. *See In re Elsub*, 66 B.R. 189, 196 (Bankr.D.N.J.1986) ("[I]t is clear that this court must permit [the debtor] to conduct further inquiry into the pre-filing inquiry and objective and subjective motivations of [the petitioning creditor] in filing the involuntary petition[.]"); *see also In re Turner*, 80 B.R. at 620–28 (reviewing extensively the pre-filing considerations of petitioning creditors and their counsel). This Court in an effort to understand fully the basis for the filing of these involuntary petitions, agreed to review research notes and documents created in preparation for litigation by the government *in camera*. While declining to reveal in detail the contents of each document, we have incorporated our *in camera* review into our findings.

The alleged debtors have in their post trial memoranda outlined extensively their perceptions of how the government conceived and developed the idea to file these involuntary petitions. Essentially, the debtors maintain that the government has initiated criminal investigations of organizations affiliated with Lyndon H. LaRouche because of the government's belief that Mr. LaRouche is a "political extremist." [45] Accordingly, the debtors assert that the civil division of the United States Attorney's Office derived its inspiration to file these petitions from the criminal division, and thus proceeded to file these peti-

---

**45.** *See* Alleged Debtors' Proposed Findings of Facts, pp. 15 n. 2; Alleged Debtors' Proposed Conclusions of Law, pp. 11, 21; *see also* Tr.Vol. III, p. 104–09 (testimony of Assistant United States Attorney, Mr. Schiller, regarding the government's Proposed Finding of Fact 201,

which referred to Lyndon LaRouche as a "political extremist."); Amended Proposed Statement of Facts of United States, p. 59, ¶ 193 ("Each of the debtors is an affiliate of and controlled by political extremist Lyndon LaRouche.")

tions with a "prosecutorial mind-set." [46] The debtors maintain that evidence of this mind-set is found not only in the lack of evidence to support the filing of the petitions and in the decision to ignore more traditional means of collection, but by the testimony of the officials who shared responsibility for the decision to file.

The government consistently has responded to these allegations by noting that it was not operating under the direction, or on behalf of the criminal division, and actually had three very distinct policy reasons for filing these petitions. Assistant United States Attorney, Mr. Schiller, described the reasons for filing as follows:

The three social policies, if you will, if I understand how you are using that term, that I thought would be advanced by this course of action that we took were, first of all, that the available remedies and appropriate rulings of this Court and bankruptcy rules would provide the most efficient and effective manner of collection—meaning to collect the sums due the United States given the problems that I saw. Most particularly, we were concerned about the problem of intra-corporate and extra-corporate transfers of assets and how to effectively recover them, and I went through the fairly detailed analysis of the law and evidentiary questions of comparing treating something as a fraudulent conveyance under the Virginia Code versus treating something as a preferential transfer under the Bankruptcy Code, and concluded that the bankruptcy alternative would be superior, and that was really the germ of the idea to take this route.... The second policy that I was starting to go into was .. that when the United States Attorney's Office takes a litigative decision that it should reflect not only its effect on the U.S. Treasury in terms of amounts collected, but also whether it would have any adverse effect on citizens elsewhere ... This is ... what makes the U.S. Attorney's Office different as a litigating party from, say a

bank, or any other creditor in that we look not only to our financial interests but also to the social impact of the litigating decision. . In this case, it was my estimation, after I researched on the NEXUS data bank and solved the plethora of people who had been defrauded, is one term that's used frequently.... A corollary to that would be that in my view, primarily in terms of my concentration in bankruptcy, it's my view that the priority scheme of the Bankruptcy Code is the most equitable form of distribution on a class basis in the commercial realm, and that as a social policy this litigative decision would be to follow that priority scheme as a policy option.

The third policy that came to mind dealt with a number of lawsuits that I found also in my initial research of the NEXUS data bank. It struck me that there were large numbers, as we alleged in our initiating pleadings, large number of lawsuits and unpaid judgments, and from my experience in the A.H. Robins case, if I learned nothing else it was that bankruptcy provides a means of consolidating thousands of lawsuits in one form in an equitable fashion, and it seemed to me by electing the involuntary bankruptcy procedure we would further the policy, if you will, of judicial economy in saving the resources of both the courts and the individuals in terms of the need to pay lots of lawyers to do lots of things at expensive rates, and that was also a policy that would be advanced by electing this course.

Tr. Vol. III, pp. 119–22. The government further asserts that the choice to seek relief in this forum as opposed to state court, was based upon the advantage of litigating in the bankruptcy forum as cited above.

The determination of whether an involuntary petition was filed to accomplish an improper purpose, must be examined in light of the purposes of any petition in bankruptcy. The goals of bankruptcy have been described in the Report of the Com-

---

**46.** *See* Alleged Debtors' Proposed Findings of Facts, pp. 15–68; Alleged Debtors' Proposed Conclusions of Law, pp. 16–24.

mission on the Bankruptcy Laws of the United States as being threefold: "(1) equality of distribution among creditors, (2) a fresh start for debtors, and (3) economical administration." Report of the Commission on the Bankruptcy Laws of the United States, Part I, July 1973, p. 75. The involuntary petition seeks to accomplish the same goals only at the instigation of a creditor who is fearful of losing the race against other creditors of the debtor to the state court. *See* "The Occasion for Involuntary Bankruptcy," 61 Bankr.L.J. 195, 217 (1987) ("circumstances warranting involuntary bankruptcy arise from the need to protect creditors generally from the efforts of individual creditors to collect from the debtor."); "Involuntary Petitions Under the Code," 97 Banking L.J. 292, 295 (April 1980) ("The purpose of an involuntary petition for liquidation is to achieve an equal distribution of the debtor's property among each class of creditors without preferential treatment.").

▪ Upon a review of all of the evidence, and the serious concern of the debtors that they have been targeted by the government in view of their association with a figure of allegedly "political extremist" views, we find that it is mere speculation that the government was influenced by the media, and/or the criminal division of the United States Attorney's Office, and that the alleged debtors have not proven their theories by a preponderance of the evidence. Rather, we are impressed by the government's primary motivation that the involuntary mechanism was the most appropriate under the circumstances. Where the government's motivations may have been suspect to the alleged debtors, but the primary basis for filing the instant petitions was consistent with the Bankruptcy Code, it does not appear appropriate to condemn the government's action as constituting bad faith. *See In re Turner,* 80 B.R. 618, 627 (Bankr.D.Mass.1987) (noting that suspicions of debtors did not taint petitioners' actions with bad faith).

With respect to the government's alleged failure to use more traditional methods of collection, we note that it is not the use of the bankruptcy court alone in spite of the existence of alternative collection methods that converts an involuntary petition into a "bad faith" filing. A petition may be deemed to have been filed in bad faith where the petition does *not* accomplish the goals of bankruptcy and alternatives methods were available to the petitioning creditor. *In re McDonald Trucking Co.,* 74 B.R. 474, 478–79 (Bankr.W.D.Pa.1987) (noting that no evidence was offered to indicate that petitioning creditor considered any of the less radical and more traditional methods of debt collection); *In re FRP Indus., Inc.,* 73 B.R. 309, 313 (Bankr.N.D.Fla.1987) (noting that petitioning creditor made no effort at all to avail himself of collection remedies provided under state law and true motive was to use Bankruptcy Code as a means of effectuating a takeover of the debtor corporation). After reviewing all of the evidence, it appears that the decision to file the instant involuntary petitions by the government may not have been the best one in hindsight, but was made with the intent to accomplish goals consistent with the Bankruptcy Code.

The Eighth Circuit in *Basin* intimated that a sole petitioning creditor who files with the knowledge that the alleged debtor has in excess of twelve creditors has acted in bad faith. The *Basin* court, however, also found the following:

The sole purpose of Basin Electric was to file a petition quickly before the letter of credit expired. The parties had a contract dispute regarding the letter of credit. Basin Electric was motivated by the desire to attain an advantageous position with regard to the letter of credit. The use of the petition by Basin Electric to affect a nonbankruptcy purpose is *further evidence* of bad faith.

*Basin,* 769 F.2d at 487. The Eighth Circuit's recognition of "further evidence of bad faith" is consistent with the proposition that a court may not find bad faith on the basis of one factor alone. *See In re Dixie Broadcasting,* 871 F.2d 1023, 1027 (11th Cir.1989) (affirming bankruptcy and district court's determination of bad faith because neither court "improperly seized upon any single factor in determining the existence

of bad faith. Rather, the cumulative effect of all of the evidence was appropriately considered."), *cert. denied*, —— U.S. ——, 110 S.Ct. 154, 107 L.Ed.2d 112 (1989).

In determining that the bad faith of the government has not been established on the facts of this case, we do not diminish the concerns of the alleged debtors who sought vigorously to expose the allegedly improper motivations of the government throughout this litigation. We note here that the government itself may have fostered suspicions by its choice of words, and litigative zeal. An excerpt from one of the government's pre-trial filings is revealing:

> The United States filed pursuant to the Court's pretrial order, April 20, 1988, United States' Exhibits 1–129 in support of its involuntary Chapter 7 bankruptcy petitions against the debtors. As a whole, the exhibits demonstrate beyond any reasonable question that the debtors have consciously and maliciously engaged in a scheme to defraud banks, merchants, suppliers, and most cruelly the elderly by incurring debt without intent to repay the indebtedness. The Court is not likely to see an involuntary case where entry of the orders for relief

is more appropriate than these cases. With the debtors, the facts mandate entry of orders for relief.

Memorandum of Law in Support of Admissibility of United States' Exhibits, Filed April 29, 1988, p. 1.

It is possible that mixed with the government's conviction that the bankruptcy forum was the best one to address all of the alleged claims against the debtors was its sense of obligation to enforce the laws of this country. With this possibility, the question arises as to whether a bankruptcy court is a permissible forum for the government to enforce its claims and the claims of other citizens by seeking an involuntary liquidation. This question was of grave concern to the instant debtors who maintained that by considering the status of other "aggrieved creditors," perhaps even before its own standing as a creditor, the government somehow corrupted or exploited the involuntary bankruptcy process.[47]

In response, we make the following observations: First, one of the factors a court must consider when presiding over a contested involuntary petition is whether the administration of an estate in bankruptcy

**47.** The alleged debtors argued that the United States acted improperly in considering the ability to assist aggrieved creditors in the bankruptcy forum, and in turn declining to pursue state court collection proceedings. Alleged Debtors' Proposed Findings of Facts, pp. 54–63. The debtors specifically suggested that an ulterior motive of the government could be gleaned from the likelihood that the government's claim in bankruptcy would be subordinated to all other claims. *Id.*, pp. 59–60. The alleged debtors suggested that the government did not file the petition "out of a desire to invoke the bankruptcy court's jurisdiction for legitimate financial or economic motives," but rather out of a continuing effort to "prosecute the Alleged Debtors, their affiliates, officers and directors." Alleged Debtors' Proposed Conclusions of Law, p. 21. The government responded generally to the alleged debtors' contentions by noting that bankruptcy courts have "approved the role of the government" acting under the doctrine of *parens patriae,* Post Trial Memorandum of United States, pp. 44–45, defined by one of the cases cited by the government as the "power to intervene on behalf of another party who cannot protect his or her own rights." *Illinois v. Electrical Utils.*, 41 B.R. 874, 876 (N.D.Ill.1984) (determining that under section 362(b)(4) of the

Code, automatic stay does not apply to governmental unit enforcing police power, and suit filed by State of Illinois under "private citizens" provision of the Toxic Substances Control Act is exempt from the automatic stay because state is acting under its *parens patriae* power); *see In re DeFelice,* 77 B.R. 376, 380 (Bankr.D.Conn.1987) (allowing Attorney General of New York to maintain dischargeability complaint against debtor based upon the doctrine of *parens patriae,* even though the state was not a creditor "to whom such debt was owed" as prescribed by section 523(c) of Bankruptcy Code). The government further addressed the debtors' allegations by noting that the filing of the petitions was not contrary to the economic interest of the government as evidenced by the government's ability to prevent the debtors from incurring further debt, gain the opportunity to recover preferences, and consolidate pending lawsuits. Post Trial Memorandum of United States, pp. 48–52. The government also alleged that it was not certain or a foregone conclusion that the claims of the government would be subordinated, and that such a finding could only be made *after* an assessment of the alleged debtors assets and the extent to which the government was secured. *Id.*, pp. 50–51; Tr.Vol. III, p. 123.

would be beneficial to creditors other than the petitioners. A petitioner would do well to consider this question *prior* to the filing of an involuntary petition to avoid dismissal under Section 305 of the Code, which enables a court to suspend or dismiss a petition in bankruptcy if "the interests of creditors and the debtor would be better served[.]"[48] 11 U.S.C. § 305(a)(1); *see In re Fales*, 73 B.R. 44, 46 (Bankr.S.D.Ohio 1987) (even though the basis for an involuntary case has been established, 11 U.S.C. § 305 requires that we consider whether a dismissal would better serve the interests of creditors and debtor); *In re Tarletz*, 27 B.R. 787, 793 (Bankr.D.Colo.1983) (noting that even though basis for an involuntary case has been established, court must determine whether case should be dismissed under 11 U.S.C. § 305; court may consider whether the bankruptcy court or state court can better serve the interest of the creditors); *In re RAI Marketing Servs.*, 20 B.R. 943, 947 (Bankr.D.Kan.1982) (declining to abstain under 11 U.S.C. § 305 where trustee's duty to realize as much as possible for distribution for creditors was far more reassuring to creditors than debtor's dubious promises of deferred payment); *see also In re Odom Enter. Inc.*, 22 B.R. 785, 791 (Bankr.E.D.Ark.1982) ("abstention under the literal provisions of section 304, may be undertaken by court *sua sponte* [.]"). Thus, it is not the consideration of other creditors alone that can be cited as inherently improper.

Secondly, as we have stated above, although the debtors in the instant cases raised concerns regarding the ability of the government to file an involuntary petition in bankruptcy, the government is not prohibited expressly or implicitly from filing a petition as long as it qualifies as a petitioning creditor under the Code.[49] Therefore, this Court is without authority to determine that *any* involuntary petition filed by the United States Attorney's Office against a debtor who is the subject of a parallel criminal proceeding is by its nature improper, or executed in "bad faith." We suggest, therefore, that the policy considerations cited by the debtors may only be addressed by Congress.

Accordingly, this Court grants the motions of Caucus Distributors, Inc., Campaigner Publications, Inc., and Fusion Energy Foundation, Inc. to dismiss the involuntary proceedings pending against them. Upon the filing of an appropriate motion and a hearing thereon this Court will consider the alleged debtors' request for costs and fees under 11 U.S.C. § 303(i).

An appropriate order shall enter.

---

**48.** Section 305 of the Bankruptcy Code provides in part:

(a) The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if—

(1) the interests of creditors and the debtor would be better served by such dismissal or suspension[.]

11 U.S.C. § 305(a)(1).

**49.** Courts have determined that a petitioning creditor has acted in bad faith when it was not in fact a creditor at the time of the filing. *See In re Hunt*, 496 F.2d 882, 885 (5th Cir.1974) (determining that three of four creditors were not "true and valid" and therefore, petition not before the court in good faith); *In re Hudson Coal Co.*, 22 F.Supp. 768, 771 (M.D.Pa.1938)

(upon admission of six petitioning creditors that they purchased their bonds for the purpose of instituting reorganization proceeding, court determined that "such action shows the lack of the good faith required by section 77B of the Bankruptcy Act for which the petition must be dismissed."); *In re Philadelphia Rapid Transit Co.*, 8 F.Supp. 51, 55 (E.D.Pa.) (denying approval of a petition which was not "in truth a real creditors' petition and in this sense not in good faith"), *aff'd*, 73 F.2d 1022 (3d Cir.1934). It is unclear, therefore, whether the government would be able to sustain an involuntary petition under the doctrine of *parens patriae* if it were not in fact a holder of a claim in accordance with 11 U.S.C. § 303(b)(1). *Compare supra* note 47 (citing cases which have acknowledged doctrine of *parens patriae* ).